491 A.2d 1186

# BOARD OF EDUCATION OF MONTGOMERY COUNTY

v.

## Milton A. PAYNTER et al.

No. 123, Sept. Term, 1984.

Court of Appeals of Maryland.

May 9, 1985.

24

Roger W. Titus, Rockville, for appellant.

Mark D. McCurdy, Asst. Atty. Gen., Baltimore, for appellee, Department of Employment Security.

Stephanie Klein, Legal Aid Bureau, Silver Spring, for appellee, Milton A. Paynter.

Stephen H. Sachs, Atty. Gen. and Diana G. Motz, Asst. Atty. Gen., Baltimore, on brief for appellee, Department of Employment Security.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

ORTH, Judge.

The General Assembly of Maryland has declared that in its considered judgment the public good, and the general welfare of the citizens of this State require the enactment of [an unemployment insurance law], under the police powers of this State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own. Md.Code (1957, 1979 Repl.Vol., 1984 Cum.Supp.) Article 95A, § 2.

Milton A. Paynter, a teacher employed by the Board of Education of Montgomery County, thought that the reserves so set aside should be tapped for his benefit because, he believed, he had become unemployed through no fault of his own. He applied to the Unemployment Insurance Division of the Employment Security Administration, which, as a part of the Department of Human Resources, was then charged with the administration of the Unemployment Insurance Law, codified at Art. 95A. (Hereinafter section citations are to Art. 95A unless otherwise noted.) His claim for benefits was referred to a claims examiner who denied it. § 7(c). Paynter was not happy with the examiner's decision and sought help from the Board of Appeals of the Employment Security Administration. § 7(c)(ii) and (e). The Board referred the matter to a referee. The referee conducted an evidentiary hearing, made findings and conclusions, and on the basis thereof reversed the determina-

tion of the examiner, holding that there was to be "no denial of benefits." § 7(e). The decision of the referee aggrieved Paynter's former employer, and it sought review by the Board of Appeals. § 7(f). The Board, on the basis of evidence previously submitted before the referee, adopted "the facts and reasoning contained in the decision of the Appeals Referee" and affirmed his decision. *Id.* The Board of Education of Montgomery County was by no means satisfied. It secured judicial review of the decision of the Board of Appeals by appeal to the Circuit Court for Montgomery County. § 7(h).[1] The court was persuaded by Paynter, who was joined by the Board of Appeals, represented by the Attorney General of Maryland, that within the statutory limitations of its scope of review, it should affirm the decision of the Board of Appeals. *Id.* The Board of Education of Montgomery County was still not convinced that Paynter was entitled to benefits. It took an appeal to the Court of Special Appeals. *Id.* We found that review of the case by this Court before the intermediate appellate court had rendered a decision was desirable and in the public interest, and ordered by writ of certiorari that the case be certified to us. We are called upon to determine who was out of step—the examiner or the referee, the Board of Appeals and the circuit court.

This case is governed by § 6(a) of the Unemployment Insurance Law. Its provisions were applied by the examiner, the referee, the Board of Appeals and the circuit court in reaching their respective decisions. We must reach our decision in the light of its dictates. Section 6 concerns "Disqualification for benefits." It enumerates a number of circumstances under which an individual shall be disqualified completely or partially for benefits. The first of these circumstances is "Voluntarily leaving work," and it is dealt with in subsection (a).

---

1. By this time the administration of the Maryland Unemployment Insurance Law had been placed under the Department of Employment and Training. Acts 1983, Ch. 64 codified at Md.Code (1957, 1979 Repl.Vol., 1984 Cum.Supp.) Art. 95A, § 11(a) and (b).

28

■■■ An individual is disqualified for all benefits if his "unemployment is due to his leaving work voluntarily without good cause." He is partially disqualified for benefits if his unemployment is due to his leaving work voluntarily because of valid circumstances. The extent of the disqualification depends upon the seriousness of the valid circumstances. Purely personal reasons, no matter how compelling they may be, provide no excuse for voluntarily leaving work. The subsection gives three examples. "Leaving work," it declares, "to become self-employed, to accompany or join one's spouse in a new locality, or to attend an educational institution is neither good cause nor a valid circumstance for voluntarily leaving work." With respect to good cause,

> [o]nly a cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer may be considered good cause.

With respect to a valid circumstance,

> [o]nly a substantial cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer, or another cause of such necessitous or compelling nature that the individual had no reasonable alternative other than to leave the employment may be considered a valid circumstance.

Other than these guidelines as to what good cause and valid circumstance must be and may not be, the legislature left the determination of what amounts to both good cause and valid circumstance in the hands of the administrative agency charged by it to administer the Unemployment Insurance Law. That the legislature was relying on the expertise of the agency in this regard is clearly evident from the language of subsection (a) "[i]f *the Executive Director finds* that the individual's unemployment is due to his leaving work voluntarily without good cause," and "according to the seriousness of valid circumstances *as determined in each case by the Executive Director....*" *(Emphasis supplied).*

To ascertain and effectuate the actual legislative intention in enacting any statute is, of course, the cardinal rule of statutory interpretation. In this regard, the primary source of legislative intent is the language of the statute itself. Where the statutory provisions are unambiguous, no construction is required, so that a plainly worded statute must be construed without forced or subtle interpretations designed to extend or limit the scope of its operation. *State v. Intercontinental, Ltd.*, 302 Md. 132, 137, 486 A.2d 174 (1985) (citations omitted).

The provisions of § 6(a) are unambiguous and we need not go behind what the statute plainly says on its face to ascertain the legislative intent.

■ The Board of Education would have the "necessitous or compelling" provision related in the statute to valid circumstance apply equally to good cause. To do otherwise, it states, would result in a more onerous standard for the payment of limited benefits than for the payment of full benefits. This, it suggests, would be absurd in light of the purposes of the Unemployment Insurance Law and the policy regarding it announced by the legislature. *See* § 2. The invalidity of the argument of the Board of Education is readily apparent on the face of the statute. Neither good cause nor valid circumstance may be predicated upon a purely personal reason. But, although the statute commands that good cause be job-related, it recognizes a cause in addition to one that is job-related with respect to a valid circumstance. It is this alternative cause provided with respect to valid circumstance, and not applicable to good cause, which must meet the "necessitous or compelling" test. Provision for the additional cause as to valid circumstance is clearly spelled out in the statute when it prescribes:

Only a substantial cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer, *or another cause* of such necessitous or compelling nature that the individual had no reasonable alternative other than to leave the

employment may be considered a valid circumstance. (Emphasis supplied).

The obvious rationale for the strict test required as to this alternative non-job-related cause is that if the employer must contribute to the payment of benefits arising from a cause not connected with the claimant's employment or the employer's actions, that cause should have a higher standard of proof. It is perfectly plain from the statutory language that the legislature did not intend that the necessitous or compelling requirement apply to good cause.

As we have indicated, the decision at each level of appeal was based upon the evidence adduced at the hearing conducted by the referee and his factual findings thereon. Indeed, the evidence stands undisputed and unrefuted. It consists in major part of the testimony of Paynter, testifying in his own behalf and of the testimony of John Joseph Dalton, assistant principal of Wheaton High School, called by the Board of Education. We give a compendium of their testimony.

Paynter was a full-time teacher of Spanish with the Montgomery County School System from 31 August 1981 to 30 November 1982 when his resignation became effective. The first year of his employment was spent at White Oak Junior High School and Springbrook High School. The difficulties which led to his resignation occurred during his three months at Wheaton High School. He explained why he resigned:

I left primarily because I was being harassed on a daily basis. I was threatened and I felt that I wasn't really receiving the type of aid that I felt I deserved from the administration to deal with the problem.

Apparently the seed of the harassment was planted while Paynter was at Springbrook when a student named Allen Studivan started a fight with Paynter. On Paynter's second day at Wheaton he came upon Studivan with a group of students. Studivan saw Paynter and said something to his

companions who started laughing. Paynter heard them refer to him as a "faggot" or a "fag." Thereafter

> I would hear these sort of references, faggot, mother fucker, this sort of thing, on a daily basis when I walked down the hall, when I go through the cafeteria, when I go to the bathroom, they would also, this group of guys, which is about 12–15 of them, they would come by my classroom and yell "faggot" inside my class. They opened up my door when I was teaching, slammed the door, they would bang on my door and the window, the glass windows of the class when I would be teaching. One point they posted a dirty picture on the window of my class, Dr. Dalton saw that. There were a few other incidents here and there, but you know they are so numerous that I can't really recall all of them, all of them.

This harassment occurred on a daily basis, sometimes once a day, "sometimes it was several times [a day], several different incidents." For about two weeks Paynter tried to ignore the harassment. "I thought it was just something that the students were doing because I was a new teacher at the school.... I thought it ... was just a little prank-type deal that they were doing, and it would die out, but after I saw ... that it was a continuous thing, and would continue, that's when I sought the help of the administration." He reported to Dalton the name of a boy who walked by his door and yelled "faggot." Dalton suspended the boy for a day. Paynter later talked to the principal of the school who told him that unless he could

> "absolutely, positively, identify who had said what to [him], where, and on what particular occasion, there wasn't much that he could do."

Paynter observed that "[u]nfortunately, generally when these incidents occurred, the people who were doing them were in groups of four and five or larger, none of whom were my students, and I didn't even know their names...." To Paynter's knowledge the principal did not conduct an investigation on his own; he never saw the principal any-

where in the vicinity of his classroom door. The principal told Paynter that he had "walked in the corridor around the corner from [Paynter's] classroom where the kids would hang out at lunch time and start their little antics" but "he never saw them or heard them issuing any kind of remarks or doing any kind of thing to harass [Paynter]."

Paynter testified to only one incident concerning a threat. He told his "favorite class," one in which he had "very good rapport" with the students, that he planned to leave because he was having "some problems with students." After school the next day, one of the students, Anita Williams, said to him that "these guys that have been harassing you, they told me that they better not find out when your last day is, that is working at the school...." Miss Williams did not know what they planned to do.

The harassment and haranguing affected Paynter. He said:

I tended to be very nervous and uptight all the time, and dreaded coming to work in the morning. I also spent several nights without sleep, I couldn't get to sleep because of nerves; many times I couldn't eat all day because of the nervousness, upset stomach....

Paynter submitted his resignation on 20 October 1982, effective 30 November, giving notice as called for by the rules. "I figured, you know, to keep the school from being in the lurch or whatever, I would stick it out for the full 30 days." Several teachers and some students tried to convince him to change his mind, and, in fact, persuaded him to the extent that he went to the principal to take back his letter of resignation, but the principal said that it was too late and there was nothing he could do. On cross-examination it was elicited that Paynter had not consulted a physician as a result of his reactions to the harassment nor had he talked to any of the students who may have been involved. Upon inquiry by the referee, Paynter said that he had discussed the matter with both the principal and assistant principal several times. Dalton told Paynter that he was talking to the students and would try to watch and see

what was going on. Asked whether he thought that Dalton was trying to correct the situation to the best of his ability, Paynter said, "I felt that he was trying somewhat, but not necessarily to the best of his ability, no." The efforts were "minimal . . . and quite insufficient." Paynter did not suggest a course of action. He was a new teacher and did not know what to do. The harassment continued.

Dalton had no doubt that Paynter had accurately described what had taken place. The referee asked Dalton if he believed that the events were occurring as Paynter indicated or whether Dalton had any reason to disbelieve Paynter. Dalton replied:

> No, none whatsoever. I'm sure they were. I was not aware of the frequency and the extent until . . . he was already getting ready to leave. I certainly believe this happened; in one case I suspended the boy for doing it. So something was going on for sure.

But, Dalton explained, "I have to know exactly who did what, and have proof; to see it or have somebody else witness it. Like for instance, the verbal abuse, I didn't witness it. Mr. Paynter did and that was enough, but a voice out of a group, no way."

Dalton testified that Paynter had talked to him "early on" about Studivan. Dalton then talked to Studivan and told him to leave Paynter alone. Studivan's name was not thereafter mentioned by Paynter. Dalton also talked to two other students he had observed yelling in the door, and to their parents and, to the best of Dalton's knowledge, they were not involved again. The School System employs Safety Security Assistants who monitor the halls to make sure the students get into classes on time and to discourage unauthorized visitors. Dalton asked the guards to spend extra time around Paynter's classroom door. He himself went to the vicinity of the classroom several times but his personal attention to the Paynter problem was limited by his other responsibilities. At the time Paynter resigned, the school authorities had no plans for discontinuing his employment.

The referee's findings of fact are in substantial accord with the evidence adduced before him. They led to the following conclusions:

The evidence reveals that the employer did try to take corrective measures to discipline students who had harassed the claimant in this case. The claimant was a teacher who was teaching Spanish or attempted to do so at the local high school. The perpetrators of the harassment were, in fact, students who called obscenities to the claimant during classroom times and would encourage other disciplinary problems. The claimant felt harassed and felt he could not continue. Even though the employer's assistant principal attempted to discipline the students, the harassment continued. The claimant, therefore, voluntarily quit because of the conditions of employment. While it may have been beyond the control of the employer to correct the situation, if it was, then the claimant had the same difficulties in correcting the situation and the conditions of employment were beyond perhaps both side's control. Nonetheless, the claimant left for reasons attributable to the employer because of the conditions of the employment and, consequently, his leaving work constitutes good cause for leaving otherwise suitable employment.

In reversing the determination of the claims examiner, the referee decided:

The unemployment of the claimant was caused by his leaving work, but with good cause, within the meaning of Section 6(a) of the Maryland Unemployment Insurance Law. There is no denial of benefits.

■■■ Inasmuch as the Board of Appeals is excluded from the Administrative Procedure Act, *see* Md.Code (1984) § 10–202(a)(3)(iii) of the State Government Article, the scope of judicial review of decisions of the Department of Employment and Training regarding claims for the payment of unemployment benefits is set out in the Unemployment Insurance Law. Section 7(h) provides:

In any judicial proceeding [in regard to claims for benefits], the findings of the Board of Appeals as to the facts, if supported by competent, material and substantial evidence in view of the entire record, and in the absence of fraud, shall be conclusive, and the jurisdiction of [the circuit court] shall be confined to questions of law.

These provisions are typical of the usual prescriptions spelling out the scope of judicial review with respect to administrative agencies. They translate into the substantiality of the evidence standard. *Insurance Comm'r v. Nat'l Bureau*, 248 Md. 292, 309–310, 236 A.2d 282 (1967). That is to say, a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency, but it must not itself make independent findings of fact or substitute its judgment for that of the agency. Of course, a reviewing court may always determine whether the administrative agency made an error of law. Therefore, ordinarily, the court reviewing a final decision of an administrative agency shall determine the legality of the decision and whether there was substantial evidence from the record as a whole to support the decision.

In *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 390 A.2d 1119 (1978), Eldridge, J., speaking for the Court and citing and quoting from cases within and without the State, treatises and law journals, discussed the meaning and application of "substantial evidence." He observed that "substantial evidence" has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The scope of review is limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. In applying the substantial evidence test, the reviewing court should not substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken. The reviewing court also must review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie

correct and carry with them the presumption of validity. Furthermore, not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences. *Id.* at 512–513, 390 A.2d 1119. We affirmed the views expressed in *Nat'l Bureau* and *Bulluck* in *P. G. Doctor's Hosp. v. HSCR Comm'n,* 302 Md. 193, 200–202, 486 A.2d 744 (1985) and even more recently in *Johns Hopkins Hospital v. Ins. Comm'r,* 302 Md. 411, 418, 488 A.2d 942 (1985) and *Baltimore Lutheran High School Association, Inc. v. Employment Security Administration,* 302 Md. 649, 663, 490 A.2d 701 (1985).

Inasmuch as the Board of Appeals adopted the reasoning the referee followed in reaching his conclusion, both this Court ·in determining whether the circuit court erred, and the circuit court in determining whether the Board of Appeals erred, must look to the decision of the referee. At issue is the propriety of the conclusion of the referee that Paynter left his employment with good cause.

■■■ The Board of Education claims that the referee used the wrong standard in applying the provisions of § 6(a) to the facts, and, therefore, the referee's conclusion must be reversed. This claim is founded on the belief of the Board of Education that the referee applied a subjective test rather than an objective test. All the parties to this appeal, the Board of Education, Paynter and the Board of Appeals, agree that the objective test is the proper one.[2] We are in accord with this view. *Uniweld Products, Inc. v. Industrial Rel. Com'n, Etc.,* 277 So.2d 827 (Fla.App.1973) sets out

---

2. The Board of Education cites as support by analogy *Management Personnel Serv. v. Sandefur,* 300 Md. 332, 342, 478 A.2d 310 (1984) and *Beye v. Bureau of National Affairs,* 59 Md.App. 642, 652, 477 A.2d 1197, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984). The Board of Appeals notes in its brief that it does not disagree with the Board of Education's reading of *Beye* and *Sandefur* "as indicating an objective test should be employed in determining good cause." It states that the Board of Appeals "uses such a test."

the criteria to be used in determining the question of good cause in this way:

> To voluntarily leave employment for good cause, the cause must be one which would reasonably impel the average able-bodied qualified worker to give up his or her employment.
>
> \* \* \* \* \* \*
>
> The applicable standards are the standards of reasonableness as applied to the average man or woman, and not to the supersensitive. *Id.* at 829. (Citations omitted).

*See* Annot. 76 A.L.R.3d 1089, 1092–1093 (1977). *Cf. Management Personnel Serv. v. Sandefur,* 300 Md. 332, 342, 478 A.2d 310 (1984); *Beye v. Bureau of National Affairs,* 59 Md.App. 642, 652, 477 A.2d 1197, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984).

Thus we agree with the Board of Education that an objective test is the proper one, but we disagree with the Board of Education's claim that the Board of Appeals applied the wrong test. Contrary to the notion of the Board of Education, we think that the referee did apply an objective test. The Board of Education seizes upon two words in one sentence of the referee's conclusions: "The claimant *felt* harassed and *felt* he could not continue." (Emphasis added.) This is the basis of the Board's argument that a subjective test was used. We believe, however, that in this instance the use of the word "felt" serves as no more than a description of Paynter's reaction to the conduct of the students, and it shows that he made a claim for benefits in good faith. In the light of the referee's entire opinion, the use of the word "felt" does not establish the application of a subjective standard. There is no indication that the referee determined that there was good cause only because Paynter *felt* that he was harassed. The referee found that the conduct of the students constituted harassment and that Paynter had in fact been harassed. The referee made repeated references to harassment in an objective context not coupled in any way with Paynter's personal feelings.

In addition, the assistant principal testified that the acts of the students were in fact disruptive. A reasonable inference is that the disruptive acts would harass the average person, and we think that this is how the referee considered the acts in reaching his decision. We see no indication that Paynter was the "supersensitive" person that the Board of Education would make him out to be.

■■■■ The second of the Board of Education's allegations that there was error in reaching the conclusion that Paynter quit his job with good cause focuses on the decision of the circuit court. The Board of Education claims that the court "utilized the wrong standard of review in connection with the appeal decided by it." The point of this claim is that the circuit court applied the substantiality of the evidence test in affirming the conclusion of the referee. It is clear that the circuit court did so. The court said:

> It is not for the court to make its own conclusions as to whether this evidence shows "good cause." It is the court's function to determine whether there is evidence to support the Board [of Appeals'] conclusion. There was evidence to support a finding that Mr. Paynter left his employment at Wheaton High School for good cause. This conclusion was not arbitrary or unreasonable.

The circuit court declared that it was the function of the Department of Employment and Training to set the guidelines for good cause. "It is this Department that has the expertise in the field not the court."

The Board of Education contends that "the instant case does not involve one of resolution of disputed facts by an administrative agency and judicial review thereof, but rather an interpretation of law and the application thereof to essentially undisputed facts." It follows, the Board of Education claims, that the substantiality of the evidence is not involved. Therefore, in its view,

> [t]he lower court fundamentally misunderstood its role in reviewing the case before it. There is an essential distinction between the role of a court reviewing a decision

of an administrative agency where sufficiency of the evidence is in dispute, as opposed to cases in which the correctness of a legal interpretation is at issue. The Board of Education deems "good cause" in the face of undisputed facts, as here, to be solely a question of law and calls upon us "to review the question of law raised by [it] and determine whether the application of the undisputed facts to the law was correct in the instant case." We refuse to determine the propriety of the conclusion of the referee that Paynter had good cause to quit his job without regard to the substantiality of the evidence. We stated flatly in *Baltimore Lutheran High School Association Inc., supra,* that if conflicting inferences as to the ultimate question could be inferred from existent facts, that is, in that case it could be inferred that the purpose of the school was or was not primarily religious, it was for the agency to draw the inference, not the reviewing court. We declared, "We have followed this principle in the past, *see, e.g., Comptroller v. Haskin,* 298 Md. 681, 472 A.2d 70 (1984), and we shall continue to do so." *Id.* 302 Md. at 664, 490 A.2d 701. We did in fact continue to do so in *Ramsay, Scarlett and Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296 (1985), and we do so in the instant case. Consistent with our recent opinions, we do not agree that "good cause" as used in § 6(a) is solely a question of law in the frame of reference of the undisputed facts of this case.

The facts before the referee were subject to conflicting inferences, namely, that Paynter left his employment with good cause or that he left without good cause. Therefore, it was for the referee to draw the inference, not the reviewing court, and the propriety of the referee's conclusion that Paynter had good cause to leave is governed by the substantial evidence standard. It follows that the circuit court did not err in applying that standard.

On our review of the entire record, we believe that there was substantial evidence to support the decision

of the referee. As we have seen, there was frequent harassment which disrupted the class, demeaned and disturbed Paynter and was beyond the control of the school authorities. Paynter put the matter succinctly in his letter of resignation:

> My reason for leaving, as you know, is the harassment and haranguing which I have had to endure from a group of students whose actions have been assiduous since the second day of this school year. Granted Dr. Dalton as well as yourself have taken some measures against a few of the guilty students, but it is my contention that not enough has been done to rectify the problem.

> Surely, kids will be kids, but after seven weeks of this type of abuse and defamation even the most patient of us would say enough is enough.

A reasoning mind could have reasonably reached the conclusion that Paynter had good cause to leave his employment. Therefore, since the reviewing court, honoring the expertise of the agency, must review the referee's determination in the light most favorable to the agency (the agency's decision is prima facie correct and carries the presumption of validity), the decision of the referee must be left undisturbed in the absence of an error of law. *Baltimore Lutheran High School Association, Inc.*, 302 Md. at 663–664, 490 A.2d 701.

 The referee made no error of law. He approached the issue in the light of the applicable statute, § 6(a). He recognized the two relevant criteria statutorily prescribed for entitlement to unemployment benefits, namely, that there be good cause for the unemployment and that the cause be directly attributable to, arising from, or connected with the conditions of employment. He comprehended the legal substance of the appropriate test and did not misapply its precepts to the undisputed facts. *See Ramsay, Scarlett & Co. Inc.*, 302 Md. at 838, 490 A.2d 1296. The referee was not erroneous in his conclusion that Paynter quit his job with good cause.

The circuit court in affirming the Board of Appeals adhered to its proper function of judicial review and did not perform the administrative function that §§ 6(a) and 7(h) commit to the agency. It declared that it was the function of the Department of Employment and Training to set the guidelines for good cause. "It is this Department that has the expertise in the field not the court." The court found from the provisions of the statute that this was the legislative intent. It clearly affirmed the order of the agency on the agency's findings and for the reasons stated by the agency. There was no *post hoc* rationalization for agency action on the part of the circuit court. In other words, the circuit court did not search the record for reasons to support the agency's judgment that were not considered by the agency. It did not affirm the agency's decision for reasons not relied upon by the agency, but found that there was substantial evidence to support the referee's decision. This was enough in the circumstances to sustain the agency's order on the agency's findings and for the reasons stated by it. *See United Steelworkers v. Beth. Steel,* 298 Md. 665, 679, 472 A.2d 62 (1984). We hold that the circuit court did not err in affirming the Board of Appeals.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED;

COSTS TO BE PAID BY APPELLANT.