521 A.2d 1225

**G. HEILEMAN BREWING COMPANY, INC.**

v.

**The STROH BREWERY COMPANY.**

**Misc. No. 13, Sept. Term, 1986.**

Court of Appeals of Maryland.

March 13, 1987.

Jay N. Varon (Jane Golden Belford, Sheila McDonald Gill and Foley & Lardner, on brief), Washington D.C., and William A. Snyder, Jr., Ober, Kaler, Grimes & Shriver, on brief, Baltimore, and David E. Beckwith and Foley & Lardner, on brief, Milwaukee, Wis., for appellant.

Thomas M. Wilson III (J. Hardin Marion, Rebecca A. Laws and Tydings & Rosenberg, on brief), Baltimore, for appellee.

Before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

COUCH, Judge.

This case comes to us from the United States Court of Appeals for the Fourth Circuit, pursuant to the Maryland Uniform Certification of Questions of Law Act. Md.Code (1974, 1984 Repl.Vol.), §§ 12–601 to –609 of the Courts and Judicial Proceedings Article. The Fourth Circuit has certified for our determination the following questions:

 1. Whether the Maryland Beer Franchise Fair Dealing Act applies to an agreement between a franchisor and a franchisee where the franchisee is also a manufacturer of beer, in competition with the franchisor.

 2. Furthermore, if the Act does apply to such an agreement,

 a. whether the language "unless good cause exists" of § 203C raises a question of fact or a question of law, and if it raises a question of law, whether good cause exists where the franchisor terminates the franchisee after the franchisee fails to distribute, in violation of the agreement, due to a strike of the franchisee's employees, and

 b. whether the 180–day notice provision of § 203D applies to such an agreement.

## I

Appellant, G. Heileman Brewing Company (Heileman), is a Wisconsin corporation engaged in the business of brewing and selling beer in Maryland and throughout the United States. Appellee, The Stroh Brewery Company (Stroh), is an Arizona corporation involved in the same commercial enterprise.[1]

In December of 1983, Heileman entered into a Wholesaler Agreement (Agreement) with Stroh, under which Heileman's Carling National Breweries Division became the ex-

---

**1.** We accept the statement of facts submitted by the certifying court. *Food Fair Stores v. Joy,* 283 Md. 205, 219 n. 7, 389 A.2d 874, 882 n. 7 (1978).

clusive distributor of certain brands of Stroh's beer in Baltimore City and in part of Baltimore County. The Agreement provided that Heileman could transfer its distribution rights subject to Stroh's approval. Stroh also had the right to terminate the Agreement if, *inter alia,* Heileman, "without the prior written consent of Stroh, cease[d] conducting ... business with respect to any one or more Stroh brands."

In April 1985, Heileman commenced negotiations for the sale of its entire wholesale distribution business with several potential purchasers. The purchasers included H & S Distributing Company (H & S), a distributor for Stroh in counties adjacent to Baltimore County; Winner Distributing Company (Winner), a distributor for Stroh in the Baltimore area of Stroh brands not distributed by Heileman; and Best Way Distributing Company (Best Way), a distributor previously unassociated with Stroh.

On July 3, 1985, a strike at Heileman's Carling distribution center in Baltimore forced the company to stop distributing Stroh brands of beer. Heileman informed Stroh that same day of the former's intention to sell its distribution rights to H & S and Best Way. Heileman also advised Stroh that, pending Stroh's approval of the sale, Heileman would continue to distribute Stroh brands through H & S and Best Way on a temporary basis. Both parties dispute whether Heileman distributed Stroh brands after July 3.

Stroh refused to consent to the temporary distribution plan, but Heileman continued to negotiate sales with H & S and Best Way. On July 5th, Heileman transferred part of its Stroh brand distribution rights to H & S and the balance to Best Way. The sales to these companies were conditioned upon Stroh's approval, as required by the Wholesaler Agreement.

Stroh notified Heileman orally on July 25 and in writing on July 29 that Stroh would not approve the sales to H & S and Best Way. The following day, Stroh terminated the Agreement with Heileman purportedly on the ground that

Heileman had ceased distributing Stroh brands, which as noted was a basis for terminating the Agreement. Subsequently, Stroh appointed Winner as the distributor of Stroh brands in Heileman's territory.

Thereafter, Heileman filed a three count complaint against Stroh in the United States District Court for the District of Maryland, alleging violation of the Maryland Beer Franchise Fair Dealing Act, Md.Code (1957, 1981 Repl. Vol.), Art. 2B, §§ 203A–203G (the "Act"), breach of contract, and tortious interference with contractual relations. In response, Stroh filed a motion to dismiss. The federal district court concluded that the Act was not applicable to the instant case. The court stated in part:

"This Court cannot conclude that the General Assembly, when passing the Act, intended to protect Heileman, a national brewery, from undue economic pressure brought to bear by Stroh, another national brewery. Such a result is avoided by holding that the Maryland legislature did not intend the Act to be applied in situations involving commercial relationships between two prominent national breweries."

Rejecting the breach of contract and tortious interference claims, the court also held, under the facts as alleged, that Stroh had properly refused Heileman's proposed sale and lawfully terminated the Wholesaler Agreement. Accordingly, the court dismissed Heileman's claims for failure to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6).

Heileman appealed the lower court's decision to the United States Court of Appeals for the Fourth Circuit. After reviewing briefs and holding oral argument, the Fourth Circuit concluded that the absence of Maryland authority interpreting the Act warranted certifying the present questions under consideration. The federal appellate court reserved Heileman's claims for breach of contract and tortious interference with contractual relations for its own consideration.

## II

According to the Declaration of Policy set forth in the Act, the Maryland Beer Franchise Fair Dealing Act was enacted in 1974 to foster and promote temperance in the consumption of beer. Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203A(a). *See Erwin & Shafer, Inc. v. Pabst Brewing Co.*, 304 Md. 302, 310, 498 A.2d 1188, 1192 (1985). To effectuate this purpose, the Act seeks to deter beer manufacturers from inducing or coercing beer distributors into stimulating sales of beer products. *Erwin & Shafer*, 304 Md. at 310, 498 A.2d at 1192. The operative provision is section 203B, which reads as follows:

> No beer manufacturer shall (1) induce or coerce, or attempt to induce or coerce, any beer distributor to accept delivery of any alcoholic beverage, any form or advertisement, or any other commodity, which shall not have been ordered by the beer distributor; (2) induce or coerce, or attempt to induce or coerce, any beer distributor to do any illegal act or thing, or do any other act unfair to the beer distributor, by threatening to cancel, terminate, or refuse to renew any beer franchise existing between a beer manufacturer, or representative thereof, and a beer distributor; (3) fail or refuse to deliver to a beer distributor having a franchise, or agreement, any beer publicly advertised by it or its agents for immediate sale promptly after such beer distributor's order shall have been received.

According to the legislature, a beer manufacturer can exert leverage on a beer distributor in a number of direct or subtle ways. These include the "threatened or actual termination of the manufacturer and distributor relationship," and "the establishment of dual distributors of a brand or brands ... in a territory presently served by a [single] distributor." *Id.* at § 203A(a). The elimination of this kind of intimidation or coercion provides distributors with a measure of commercial stability, thereby encouraging them "to make investments in their facilities to serve retail licensees." *Id.*

Incident to its operation, the Act characterizes various commercial arrangements between beer manufacturers (or "franchisors")[2] and beer distributors (or "franchisees")[3] as a "franchise" or "agreement." *Id.* at § 203A(b)(1).[4] The Act then imposes specific restrictions on and affords certain

2. "Beer manufacturer" means every brewer, fermenter, processor, bottler or packager of beer located within or without the State of Maryland, or any other person whether located within or without the State of Maryland who enters into a "franchise" or an "agreement" with any beer distributor doing business in the State of Maryland. Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203A(b)(5). A "Franchisor" means any beer manufacturer who enters into any franchise or agreement with a beer distributor or any beer manufacturer who is a party to a franchise or agreement as defined herein. *Id.* at § 203A(b)(3). We shall use the terms "beer manufacturer" and "franchisor" interchangeably.

3. "Beer distributor" means any person importing or causing to be imported into this State, or purchasing or causing to be purchased within this State, any beer for sale or resale to retailers licensed under this article without regard to whether the business of such person is conducted under the terms of a franchise or any other form of an agreement with a beer manufacturer or manufacturers. Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203A(b)(4). A "Franchisee" means any beer distributor to whom a franchise or agreement as defined herein is granted or offered or any beer distributor who is a party to a franchise or agreement as defined herein. *Id.* at § 203A(b)(2). We shall use the terms "beer distributor" and "franchisee" interchangeably.

4. "Franchise" or "agreement" shall mean one or more of the following: (i) a commercial relationship between a beer distributor and a beer manufacturer of a definite duration or indefinite duration, which is not required to be evidenced in writing; (ii) a relationship whereby the beer distributor is granted the right to offer and sell the brands of beer offered by the beer manufacturer; (iii) a relationship whereby the beer distributor, as an independent business, constitutes a component of a beer manufacturer's distribution system; (iv) a relationship whereby the beer distributor's business is substantially associated with the beer manufacturer's brand, advertising or other commercial symbol designating the beer manufacturer; (v) a relationship whereby the beer distributor's business is substantially reliant on the beer manufacturer for the continued supply of beer; and (vi) a written or oral arrangement for a definite or indefinite period whereby a beer manufacturer grants to a beer distributor a license to use a trade name, trademark, service mark, or related characteristic, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, or otherwise. Md.Code (1957, 1981 Repl. Vol.), Art. 2B, § 203A(b)(1).

protections to the parties. Under section 203E, a franchisor who has contracted with a particular franchisee to distribute certain brands in a designated sales territory cannot enter into a second franchise with another beer distributor to distribute the *same* brand or brands in the former franchisee's territory. *Id.* at § 203E. *See Erwin & Shafer,* 304 Md. at 308–14, 498 A.2d at 1191–94.[5] In turn, the franchisee of a given territory is forbidden from making any "sale or delivery of beer to any retail licensee whose place of business is not within the territory granted to the franchisee." Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203F. The net effect of this statutory scheme is to eliminate intrabrand competition between franchisees in a given territory.

Once a franchise is in place, a franchisor cannot "cancel, terminate or refuse to continue or renew any beer franchise, or cause a franchisee to resign from a franchise, unless good cause exists" for such action. *Id.* at § 203C.[6] In the event good cause is shown to exist, the franchisee must be given at least 180 days prior written notice before any action is taken "to terminate, cancel or nonrenew the franchise agreement." *Id.* at § 203D.[7] The notice must state all the reasons for the intended action. *Id.* If the franchisee cures any claimed deficiency within the 180 day notice period, the proposed termination, cancellation, or

---

5. However, section 203E does not require a beer manufacturer to market all of its brands or "labels" through a single distributor in a given territory. *Erwin & Shafer,* 304 Md. at 310, 498 A.2d at 1192. As long as the distributors do not handle the same brands, a manufacturer may have a "franchise" or "agreement" with more than one franchisee in a single territory.

6. Good cause exists "if a franchisee's license to do business in the State is revoked under any provisions of [the Alcoholic Beverages] article." Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203C. The Act does not further define when good cause exists.

7. The notice provision does not apply "if the reason for termination, cancellation or nonrenewal is insolvency, the occurrence of an assignment for the benefit of creditors, or bankruptcy." Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203D.

nonrenewal becomes "null and void and without legal effect." *Id.*[8]

### III

We now consider the questions certified to us for determination.

### (1)

*Whether the Maryland Beer Franchise Fair Dealing Act applies to an agreement between a franchisor and a franchisee, where the franchisee is also a manufacturer of beer, in competition with the franchisor.*

In resolving this question, we consult the well settled rules of statutory construction. The cardinal principle of statutory interpretation is to ascertain and carry out the legislative intent. *Mayor of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984). In determining that intent, we look first to the language of the statute. *Board of Examiners in Optometry v. Spitz,* 300 Md. 466, 474, 479 A.2d 363, 367 (1984).

Both parties agree, as they must, that the literal language of the Act is broad enough to cover the Wholesaler Agreement between Stroh and Heileman, that is, a distribution agreement between a beer manufacturer and a beer distributor where the distributor is also a brewer in competition with the manufacturer. All of the definitional requirements are met in this case. The commercial relationship between Stroh and Heileman, as reflected in the Wholesaler Agreement, is a "franchise" or "agreement" under several of the definitions in section 203A(b)(1). *See supra* note 4. As a brewer doing business in this State under a

---

8. Additionally, section 203G states:

Any beer distributor or franchisee may bring an action against a beer manufacturer, franchisor, or franchisee for violation of this subtitle in any court of general jurisdiction in the State of Maryland to recover damages sustained by reason of any violation of this subtitle and, where appropriate, shall be entitled to injunctive relief. The beer distributor or franchisee, if successful, shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees.

"franchise" agreement, Stroh is both a "beer manufacturer" and a "franchisor." *See supra* note 2. As a corporation purchasing beer within Maryland for sale or resale to retailers, Heileman is both a "beer distributor" and "franchisee" under the Act. *See supra* note 3.

■ We agree with Heileman that there is simply nothing in the Act's language to indicate that the General Assembly meant to exclude from the definition of "beer distributor" and "franchisee" a beer distributor that also operates as a beer manufacturer. When the language of a statute is clear and unambiguous, ordinarily we need look no further to ascertain the legislative intent. *Erwin & Shafer*, 304 Md. at 309, 498 A.2d at 1191; *Hackley*, 300 Md. at 283, 477 A.2d at 1177.

Predictably, Stroh rejects this literal construction as "silly." [9] It seeks a narrow interpretation of the Act that excludes from the definition of "beer distributor" and "franchisee" any corporation that also functions as a brewer or beer manufacturer. In support of this contention, Stroh reasons as follows: the Act's underlying presumption is that beer manufacturers have the ability to pressure weaker distributors into stimulating beer distribution. This is so because beer distributors traditionally have fewer sources of supply and are therefore economically more dependent on those manufacturers with which it has a distribution relationship. The General Assembly sought to counterbalance the inherent power of brewers over their distributors by enacting this statutory scheme and by creating a protected class (the distributors) and a restrained class (the brewers). However, these assumptions, and thus the Act's protections, do not apply to a brewer like Heileman, which also operates a beer distributorship. Such a hybrid enterprise is not subject to undue pressure from another beer manufacturer with which it has dealings be-

---

**9.** It is axiomatic that a court must shun a construction of a statute that will lead to absurd consequences. *Erwin & Shafer*, 304 Md. at 311, 498 A.2d at 1192 (and cases cited therein).

cause it "is capable of ensuring itself a continued supply of its own beer."

Stroh is correct that the Act seeks to prevent "abuse of the power that inherently attends control over the supply of beer." However, such abuse does not occur solely because a distributor has dealings with a limited number of beer suppliers, that is, the distributor that "traditionally handle[s] mainly one, two or three brands of beer in [its] distributorship[ ]." Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203A(a).[10] A beer manufacturer can exert improper pressure over a beer distributor because the latter has invested both time and money into promoting and selling the brewer's products.[11] As so construed, the Act protects a brewer-distributor like Heileman which, by virtue of its

---

**10.** Significantly, the General Assembly did not confine the coverage of the Act to beer distributors with a limited number of beer suppliers. *See* Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203A(b)(1) (a "franchise" or "agreement" can be, but need not be, "a relationship whereby the beer distributor's business is substantially reliant on the beer manufacturer for the continued supply of beer").

**11.** According to the Stroh-Heileman Wholesaler Agreement, Heileman was required "to exert its best efforts to promote, market, sell and service each of the Stroh Brands in the Territory, all in accordance with Wholesaler Operating Performance Standards and Stroh Wholesaler Policies." The Wholesaler Operating Performance Standards stated in part:
 1. Marketing Effort.
 Wholesaler [Heileman] will aggressively market all Stroh Brands assigned to Wholesaler in order to realize the full sales potential for each Stroh Brand. Wholesaler will submit sales and marketing plans as required and approved by Stroh and will use its best efforts to work to and to comply fully with such plans and other commitments submitted. Wholesaler's marketing effort must include, but not be limited to, the following:
 Establishment of sales and distribution goals for all brands in all available packages by key segments of the retail market.
 A sales management program which classifies accounts and establishes a sufficient call frequency, based on the sales potential of accounts, and which requires route books and maintenance of accurate records reflecting sales to individual accounts and locations.
 Aggressive support of Stroh marketing and sales programs occurring in Wholesaler's Territory for the Stroh Brands with effective utilization of all materials and sales aids provided.

An appropriate program of Wholesaler-supported advertising and/or promotional efforts supplementing Stroh's activity for Stroh Brands carried.

2. Resource Employment.

Wholesaler will employ sufficient resources, including personnel, facilities and equipment, to effectively promote, merchandise, service and distribute all Stroh Brands assigned in all key market segments of Wholesaler's Territory.

5. Field Quality Control.

Wholesaler will take all necessary actions to ensure field quality of all Stroh Brands assigned, including:

Strict adherence to Stroh's Storage and Beer-Age Policy.

Proper handling and protection from damage of all Stroh products, containers and pallets.

Rotation of stock in the warehouse, on vehicles and at retail accounts to assure consumption of older beer first.

6. Management.

Wholesaler will provide fully-qualified management, with authority and responsibility for major decisionmaking as well as for the day-to-day operation of Wholesaler's Stroh Brands business, including personal involvement in maintaining continuous satisfactory liaison with the retail trade.

7. Training.

Wholesaler will assure proper training of management and other personnel through sales and marketing meetings, by participation in Stroh training programs, and with supplemental Wholesaler-developed training activity.

8. Business Conduct.

Wholesaler will conduct its business in a manner designed to sustain and expand the goodwill and high quality image of Stroh and Stroh Brands, with particular emphasis on:

Maintenance and appearance of equipment, facilities and vehicles.

Appearance and attitude of Wholesaler's employees.

Participation by Wholesaler's management in local community activities, functions and organizations.

9. Reports and Records.

Wholesaler will maintain complete and accurate reports and records with respect to:

Orders and deliveries from Stroh.

Sales and inventory.

Other reports and data as reasonably requested by Stroh.

These records and reports will be maintained in the form prescribed by Stroh, will be accessible, and will be submitted to Stroh upon request.

Failure to meet one or more of these standards could result in initiation of deficiency termination procedures, under which Stroh had the right to terminate the Wholesaler Agreement.

economic commitment to a given brewer's product, is vulnerable to pressure from that beer supplier. That such a hybrid enterprise is "capable of ensuring itself a continued supply of its own beer" does not eliminate the pressure exerted by the beer supplier. A distributor with access to its own brands will not be able to salvage the investment it has already made in marketing and selling the *supplier's* brands.[12]

The purposes of the Act are best served by including the brewer-distributor within its purview. Since this hybrid enterprise will be assured, *inter alia,* that its franchise will not be terminated absent a showing of good cause under section 203C, the distributorship component will gain a measure of stability and thus be encouraged "to make investments in [its] facilities to serve retail licensees...." Md.Code (1957, 1981 Repl.Vol.), Art. 2B, § 203A(a). We note further that the beer manufacturer is not prejudiced by such a construction. It is assured that its distributor, even though also operating as a brewer, "will focus its attention on promoting, marketing and selling the brand or brands of beer assigned exclusively to the distributor." *Erwin & Shafer,* 304 Md. at 311, 498 A.2d at 1192.

Even if we were to accept Stroh's contention that the Act reflects a singular concern for distributors with few sources of supply, its bright line rule—that the Act excludes from the definition of "beer distributor" and "franchisee" any corporation that also functions as a beer manufacturer—imprecisely reaches that intended result. For example, Stroh's rule would exclude from the Act a small distributor (with a limited number of suppliers) if it also operates a small brewery, even though, under Stroh's assumptions, this hybrid enterprise would be subject to pressure from a supplier.

---

**12.** Although the extent of the pressure on Heileman, as compared to a non-brewer-distributor, may differ in degree, it does not differ in kind.

■ If the General Assembly had intended to exclude brewer-distributors from the protections of the Act, it could easily have done so. The Act's broad and unambiguous language and the purposes served by its enactment suggest the legislature had no such intention. It bears repeating what we said recently in *Tucker v. Firemen's Fund Insurance Co.*, 308 Md. 69, 70, 517 A.2d 730, 732 (1986):

> "[W]here statutory provisions are clear and unambiguous, no construction or clarification is needed or permitted, it being the rule that a plainly worded statute must be construed without forced or subtle interpretations designed to ... limit the scope of its operation."

Accordingly, we conclude that the Act applies to an agreement between a franchisor and a franchisee, where the franchisee is also a manufacturer of beer in competition with the franchisor.[13]

### (2A)

Since the Act applies to the Stroh-Heileman agreement, we turn our attention to the second question certified to us.

*Whether the language "unless good cause exists" of § 203B raises a question of fact or a question of law, and if it raises a question of law, whether good cause exists where the franchisor terminates the franchisee after the franchisee fails to distribute, in violation of the agreement, due to a strike of the franchisee's employees.*

In *Erwin & Shafer*, 304 Md. at 313 n. 14, 498 A.2d at 1193 n. 14 (*quoting Black's Law Dictionary* 623 (5th ed. 1979)), we noted that good cause has been defined as "substantial reason, one that affords a legal excuse." We did not elaborate. Stroh argues that the statutory phrase raises a question of law: "Whether a particular set of facts,

---

**13.** It follows from our holding that a brewer-distributor such as Heileman will be subject to both the franchisor restrictions (in its role as a brewer vis-a-vis other franchisees) and the franchisee protections (in its role as a distributor vis-a-vis other beer manufacturers).

if proved, will amount to a 'legal excuse' is a question of law." We disagree.

Although we have not, as yet, considered this precise question in the context of the Maryland Beer Franchise Fair Dealing Act, we do not completely write on a clean slate. In *Board of Education of Montgomery County v. Paynter*, 303 Md. 22, 491 A.2d 1186 (1985), we considered Md. Code (1957, 1985 Repl.Vol., 1986 Cum.Supp.), Art. 95A, § 6(a) of the Unemployment Insurance Law concerning the circumstances under which an individual is disqualified completely or partially from employment insurance benefits. That section provides in part that an individual shall be disqualified from benefits "[i]f the Executive Director finds that the individual's unemployment is due to his leaving work voluntarily without *good cause*." *Id.* (emphasis added).[14]

In *Paynter*, the appellee, a teacher employed by the Board of Education of Montgomery County, argued that his withdrawal from his position was for good cause, thus entitling him to receive unemployment benefits.[15] Although his claim was initially denied, a referee with the Board of Appeals of the Employment Security Administration reversed that determination and ordered that there be "no denial of benefits."[16] On appeal, the Board of Appeals

---

14. The legislature left the "good cause" standard largely undefined, except for the following:
 "Only a cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer may be considered good cause."
 Md.Code (1957, 1985 Repl.Vol., 1986 Cum.Supp.), Art. 95A, § 6(a). *See Paynter*, 303 Md. at 28, 491 A.2d at 1189.

15. The record revealed that the appellee had been harassed by several students at the high school where he taught Spanish.

16. According to the referee:
 "The evidence reveals that the employer did try to take corrective measures to discipline students who had harassed the claimant in this case. The claimant was a teacher who was teaching Spanish or attempted to do so at the local high school. The perpetrators of the harassment were, in fact, students who called obscenities to the claimant during classroom times and would encourage other disci-

adopted "the facts and reasoning contained in the decision of the Appeals Referee" and affirmed the decision. The Board of Education secured judicial review in the Circuit Court for Montgomery County, which affirmed. We ordered a writ of certiorari before consideration by the Court of Special Appeals.

Before this Court, the Board of Education argued that the circuit court erred in applying the substantiality of the evidence test to affirm the conclusion of the referee that the appellee left his job for good cause. According to the Board of Education, "good cause" in the face of undisputed facts is solely a question of law, subject to the substitution of judgment standard of review. *See Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834, 490 A.2d 1296, 1302 (1985). We rejected this argument by stating the following:

> "[W]e do not agree that 'good cause' as used in § 6(a) is solely a question of law in the frame of reference of the undisputed facts of this case."

*Paynter,* 303 Md. at 39, 491 A.2d at 1195. This conclusion was compelled by the nature of the good cause inquiry, where "conflicting inferences as to the ultimate question [can] be inferred from existent facts." *Id.,* 491 A.2d at 1195.

■ Our analysis in *Paynter* is applicable to the good cause determination under the Maryland Beer Franchise Fair Dealing Act. We agree with Heileman that this determination is not solely a question of law. The good cause

---

plinary problems. The claimant felt harassed and felt he could not continue. Even though the employer's assistant principal attempted to discipline the students, the harassment continued. The claimant, therefore, voluntarily quit because of the conditions of employment. While it may have been beyond the control of the employer to correct the situation, if it was, then the claimant had the same difficulties in correcting the situation and the conditions of employment were beyond perhaps both side's control. Nonetheless, the claimant left for reasons attributable to the employer because of the conditions of the employment and, consequently, his leaving work constitutes good cause for leaving otherwise suitable employment."
*Paynter,* 303 Md. at 34, 491 A.2d at 1192.

inquiry will necessarily involve a judgmental process, requiring the application on a case by case basis of established factual findings, which are often subject to varying interpretations or conflicting inferences, to the statutory standard. Since a trial court will be in the best position to evaluate the facts in light of the controlling legal principles, we would only overturn a State trial court's determination concerning good cause if it fails to meet the substantial evidence test. *See id.,* 491 A.2d at 1195. That test asks whether, in light of substantial evidence appearing in the record, a reasoning mind could reasonably have reached the conclusion reached by the trial court, consistent with a proper application of the controlling legal standard. *Ramsay, Scarlett,* 302 Md. at 838, 490 A.2d at 1303.

Since the language "unless good cause exists" is not solely a question of law, we do not express an opinion on whether good cause exists if the franchisor terminates the franchisee after the franchisee fails to distribute, in violation of the agreement, due to a strike of the franchisee's employees.

(2B)

*Whether the 180 day notice provision of section 203D applies to an agreement between a franchisor and a franchisee, where the franchisee is also a manufacturer of beer, in competition with the franchisor.*

 Having concluded that the Act applies to the Wholesaler Agreement between Heileman and Stroh, it requires no great leap of logic to further conclude that the plain language of the 180 day notice provision of section 203D is applicable as well. As we noted earlier, when the language of the Act is clear and unambiguous, it ordinarily controls. *See, e.g., Erwin & Shafer,* 304 Md. at 309, 498 A.2d at 1191. Assuming good cause exists, section 203D requires Stroh, a beer manufacturer, to provide Heileman, a franchisee, at least 180 days prior written notice of any intent to terminate, cancel, or nonrenew the Wholesaler Agreement. The notice must state all of the reasons for the intended action.

Heileman must be given 180 days from receipt of the notice to rectify any claimed deficiency. If Heileman rectifies the deficiency within that time, the proposed action becomes null and void and without legal effect.

Stroh contends that the application of the 180 day waiting period of section 203D to the unique facts of this case would "convert the Heileman-Stroh agreement into a naked restraint of trade per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Supp.1986)."[17] Retreating somewhat from this broad statement, Stroh argues in a footnote that it is "not suggesting that the Court should decide a question of federal antitrust or constitutional law." However, it asserts that in construing section 203D, we should keep in mind that a literal construction of the notice provision would run afoul of federal antitrust law, and thus render the Maryland statute unconstitutional under the Supremacy Clause of the United States Constitution.

We have long recognized the principle that "if a legislative act is susceptible of two reasonable interpretations, one of which would not involve a decision as to the constitutionality of the act while the other would, the construction which avoids the determination of constitutionality is to be preferred." *Maryland State Board of Barber Examiners*

---

**17.** Both parties have devoted a large percentage of their briefs to this issue. The federal district court seemed to agree with Stroh that application of the notice provision of section 203D in this case would raise antitrust problems:

[T]he complaint also indicates that Heileman and Stroh were competing national breweries and that Heileman's decision to stop distributing Stroh brands on July 3, 1985, effectively took Stroh brands off the Baltimore market. Should the Court determine that the 180-day requirement of § 203D applies in this case, the Court in effect would be excluding the Stroh brands distributed by Heileman from the Baltimore market for six months. Stated another way, the Court would be granting Heileman, a Stroh competitor, a right to distribute Heileman products for six months while at the same time excluding Stroh brands. Such an application of § 203D would conflict with federal antitrust policy reflected in the Sherman Act, 15 U.S.C. § 1 *et seq.*

However, since the district court had concluded the Act was not applicable, it declined to resolve any antitrust implications of § 203D.

*v. Kuhn,* 270 Md. 496, 505, 312 A.2d 216, 221 (1973). *See Davis v. State,* 294 Md. 370, 377, 451 A.2d 107, 111 (1982). Stated differently, "a construction of a statute, giving rise to doubts as to its constitutionality, should be avoided if the language permits." *Baltimore County v. Missouri Realty,* 219 Md. 155, 159, 148 A.2d 424, 427 (1959). *See Davis,* 294 Md. at 377, 451 A.2d at 111; *Slate v. Zitomer,* 275 Md. 534, 544–45, 341 A.2d 789, 795 (1975), *cert. denied sub nom. Gasperich v. Church,* 423 U.S. 1076, 96 S.Ct. 862, 47 L.Ed.2d 87 (1976); *City of Gaithersburg v. Montgomery County,* 271 Md. 505, 510, 318 A.2d 509, 512 (1974); *District Land Corp. v. Washington Suburban Sanitary Commission,* 266 Md. 301, 312, 292 A.2d 695, 701 (1972); *Barrett v. Clark,* 189 Md. 116, 127, 54 A.2d 128, 133 (1947). These cases make clear that a construction which avoids a constitutional issue must be reasonable; it must be permitted by the statutory language. *Davis,* 294 Md. at 378, 451 A.2d at 111. The construction urged by Stroh, however, is not permitted by the statutory language. In the instant case, since the plain language of the Act is clear and unambiguous, we decline to construe section 203D in light of federal antitrust principles.

Of course, the validity of the State statute, as we have construed it, is not before us. Under the Uniform Certification of Questions of Law Act, we are only authorized to answer a "question of law of *this State* which may be determinative of the cause then pending in the certifying court...." *Widgeon v. Eastern Shore Hospital Center,* 300 Md. 520, 536–37, 479 A.2d 921, 929–30 (1984) (quoting section 12–601) (emphasis added). *See Mercantile-Safe Deposit & Trust Co. v. Purifoy,* 280 Md. 46, 371 A.2d 650 (1977) (*Purifoy II*) ("we consider only questions of State law, not questions of fact or questions of federal constitutional law").

*Purifoy v. Mercantile-Safe Deposit & Trust Co.,* 273 Md. 58, 327 A.2d 483 (1974) (*Purifoy I*) is very much in point. In *Purifoy I,* the federal district court in Baltimore requested our interpretation of a 1961 amendment to section 78(c)

of the now repealed Chancery Article, Md.Code (1957, 1981 Repl.Vol.), Art. 16, § 11 *et seq.* Like Stroh, the appellees in that case argued that in construing the amendment, we should be concerned that a retroactive interpretation would violate constitutional principles. We concluded that the plain language of the amendment required a retroactive expression; therefore, we did not consider the constitutional implications of our decision. *Id.* at 64–67, 327 A.2d at 486–88. This latter issue was "solely for decision by the District Court." *Id.* at 67, 327 A.2d at 488. As in *Purifoy I,* it is beyond the scope of our authority to address Stroh's federal antitrust argument. *See Widgeon,* 300 Md. at 536–37, 479 A.2d at 929–30; *Purifoy II,* 280 Md. at 52, 59, 371 A.2d at 654, 658. Since, as we have already concluded, the Act applies to the Stroh-Heileman agreement, it is for the federal court of appeals to decide whether the 180 day notice provision, as applied, transgresses federal antitrust policy.

QUESTIONS OF LAW ANSWERED AS HEREIN SET FORTH; COSTS TO BE EQUALLY DIVIDED.