625 A.2d 342

DEPARTMENT OF ECONOMIC AND EMPLOYMENT DEVELOPMENT

v.

Richard D. HAGER.

No. 1419, Sept. Term, 1992.

Court of Special Appeals of Maryland.

June 2, 1993.

Lynn M. Weiskittel, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., Baltimore, for appellant.

Timothy J. Hogan (Thomas Minkin and the Law Offices of Peter G. Angelos, on the brief), Baltimore, for appellee.

Argued before BISHOP and HARRELL, JJ., and JAMES P. SALMON, Specially Assigned, Judge.

SALMON, Judge.

The principal issue to be decided in this appeal is whether the Board of Appeals of the Department of Economic & Employment Development ("the Board") erred when it concluded that an employee's failure to accept a transfer to another shift constituted "gross misconduct" within the meaning of section 8–1002, Labor and Employment Article, Mary-

land Annotated Code,[1] thus disqualifying the employee from receiving unemployment compensation benefits.

## *FACTS*

The relevant facts are undisputed. On May 22, 1989, appellee and cross-appellant, Richard D. Hager (Mr. Hager), was hired by Imperial Cup Corporation (Imperial Cup) as a maintenance mechanic. When Mr. Hager took the job he was told it would entail working on different shifts. Imperial Cup had three shifts: the first was 8:00 a.m. to 4:00 p.m.; the second was 4:00 p.m. to midnight; and the third was midnight to 8:00 a.m. Between May 22, 1989 and June 20, 1991, Mr. Hager worked primarily on the first shift although he also worked for nine months on the third shift and had occasionally been assigned to the second shift.

On June 19, 1991, Mr. Hager was working the first shift when his supervisor advised him that another maintenance mechanic had quit and, as a consequence, he was going to be reassigned to the second shift. Mr. Hager was selected for reassignment because he was the maintenance mechanic with the least seniority. Mr. Hager's response to the contemplated reassignment was a flat refusal. He gave no reason for his refusal except to say that the shift change "would disrupt his life style." His supervisor then suggested that he might be able to limit the duration of Mr. Hager's time on the second shift. The supervisor said that Imperial Cup would consider training other maintenance mechanics in order to allow Mr. Hager to return to the first shift after a period of between one and three months. The supervisor also said that they would consider splitting the shift between Mr. Hager and another employee while the new maintenance mechanics were being trained. After hearing this, Mr. Hager again refused reassignment. He was promptly warned that his refusal might

---

1. Unless otherwise indicated, all statutory references in this Opinion are to the Labor and Employment Article of the Maryland Annotated Code (1991 Repl.Vol.).

lead to termination. Mr. Hager responded to the warning by retorting, "You do what you have to do."

The next day, June 20, 1991, Mr. Hager was advised by his supervisor that Imperial Cup had no choice but to transfer him to the second shift and that the transfer was to be effective on July 1, 1991. Mr. Hager was asked for his response to the transfer and he said, "No, [I'm] not going to do that." The supervisor again suggested "splitting the shift" and Mr. Hager again adamantly refused reassignment. Mr. Hager was then fired.

On July 3, 1991, thirteen (13) days after he was fired, Mr. Hager filed a claim with the Department of Economic and Employment Development ["DEED"] for unemployment benefits. He said on his application for benefits that the reason he refused reassignment was that he had "child care" obligations. He acknowledged that at the time he was fired his child care problems were not permanent but were ones he "couldn't remedy . . . overnight." He admitted that his child care obligations were no longer a problem and therefore he was available to work "all hours." On his application, Mr. Hager's explanation for his failure to mention to his employer that he had child care problems was: "I got mad and offended by their trying to force something on me."

On June 25, 1991, a DEED claims examiner denied Mr. Hager unemployment benefits because in his view Mr. Hager's conduct showed "gross indifference" to his employer's interest, thereby constituting "gross misconduct" within the "meaning of Section 6(B) of the Maryland Unemployment Insurance Law." [2]

Mr. Hager appealed the claims examiner's decision. On August 28, 1991, a DEED hearing examiner conducted a full

---

**2.** The claims examiner's and hearing examiner's decisions were both rendered before October 1, 1991, pursuant to Article 95A, § 6(b). Chapter 8 of the 1991 Laws of Maryland recodified the Unemployment Insurance Law, repealing Article 95A and including that law, without substantive change, as part of the Labor and Employment Article of the Maryland Annotated Code, effective October 1, 1991.

evidentiary hearing. Only Mr. Hager and a representative of Imperial Cup testified at the hearing. Mr. Hager was asked by the hearing examiner why he refused reassignment and he responded:

> Well, at the present time my ex-wife had taken a part-time job, and she wanted me to keep my son evenings, and I said okay.
>
> I didn't know what was going to happen, and—have the second shift transfer or nothing like that. In fact, it was pretty sudden. I mean, the guy that was on second shift, he quit, and they needed me to go there, and it just—I just couldn't do it at the time.

Mr. Hager made no other explanation at the hearing as to why he had refused reassignment.

> The hearing examiner ruled, in pertinent part, as follows: Article 95A, Section 6(b) provides that an individual shall be disqualified from benefits where he/she is discharged from employment because of behavior which demonstrates a deliberate and willful disregard of standards which the employer has a right to expect. The preponderance of the credible evidence in the instant case will support a conclusion that the claimant was discharged for actions which meet this standard of the Law.
>
> Here, the employer has met its burden of proving that the claimant was discharged for gross misconduct. *The claimant gave no reason to the employer for refusing to transfer to the second shift other than it would disrupt his life.* The disruption was, in actuality, the fact that the claimant was keeping his son in the evenings so that his ex-wife could work part-time. Since the employer's intent was to start the claimant on the 4:00 to 12:00 shift on July 1, 1991, some ten days later, it must be concluded that his discharge was for gross misconduct within the meaning of the Law. Therefore, the determination of the Claims Examiner will be affirmed.

(Emphasis added.)

■ Mr. Hager appealed the hearing examiner's decision to the Board. The Board denied review and Mr. Hager appeal-

ed, pursuant to section 8–512, to the Circuit Court for Baltimore City.[3] The *circuit court heard argument and reversed the Board's finding that Mr. Hager's discharge was due to gross misconduct within the meaning of section 8–1002.* Nevertheless, the *circuit court remanded the case to the hearing examiner for the latter to determine if Mr. Hager was guilty of "misconduct" within the meaning of section 8–1003.*[4] DEED filed a timely appeal and Mr. Hager filed a cross-appeal from the trial judge's remand order. Additional facts will be included below as needed.

## *ISSUES*

## DID THE TRIAL COURT ERR IN REVERSING THE BOARD'S DETERMINATION THAT HAGER'S DISCHARGE WAS DUE TO "GROSS MISCONDUCT" AS DEFINED IN SECTION 8–1002?

The standard of judicial review of unemployment insurance determinations made by the Board is set out in section 8–512(d). Under that standard, the court should review the decision of the Board to determine only "the legality of the decision and whether there was 'substantial evidence' from the record as a whole to support the decision." *Department of Employment v. Jones,* 79 Md.App. 531, 534, 558 A.2d 739 (1989) and cases therein cited. The "substantial evidence" standard means that judicial inquiry should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not

---

3. In cases where the Board denies review, the decision of the hearing examiner is deemed to be the decision of the Board for purposes of judicial review. Section 8–806(h)(4).

4. Section 8–1003 provides that if a claimant loses his job due to "misconduct" the claimant shall be denied unemployment benefits for a period of at least five weeks but not more than ten weeks depending on the seriousness of the misconduct as determined by the Secretary of DEED. In contrast, a finding of "gross misconduct" pursuant to Section 8–1002 causes the claimant to be disqualified until the claimant is reemployed and has earned wages equal to at least 10 times the "weekly unemployment benefit of the individual."

and should not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.

*Id.* (quoting *Baltimore Lutheran High School v. Employment Sec. Adm.,* 302 Md. 649, 661–62, 490 A.2d 701, 708 (1985)).

■ The agency's decision is reviewed in the light most favorable to the agency and the reviewing court "should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken." *Board of Education v. Paynter,* 303 Md. 22, 35–36, 491 A.2d 1186 (citing *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 390 A.2d 1119 (1978)) (emphasis omitted).

Section 8–1002 reads, in pertinent part, as follows:

(a) *"Gross misconduct"* defined.—In this section "gross misconduct":

(1) means conduct of an employee that is:

(i) deliberate and willful disregard of standards of behavior that an employing unit [5] rightfully expects and that shows gross indifference to the interests of the employing unit; or

(ii) repeated violations of employment rules that prove a regular and wanton disregard of the employee's obligations; and

(2) does not include other misconduct.

(b) *Grounds for disqualification.*—An individual who otherwise is eligible to receive benefits is disqualified from receiving benefits if unemployment results from discharge or suspension as a disciplinary measure for behavior that the Secretary finds is gross misconduct in connection with employment.

■ The Board found that Imperial Cup had met its burden of proving gross misconduct as defined in section 8–1002(a)(1)(i). The question then becomes whether there was

---

5. The term "employing unit" is defined in § 8–101 as meaning, *inter alia,* "(1) an employer that has at least 1 employee engaged in covered employment for at least part of a day."

substantial evidence presented to the Board from which a reasoning mind could have reached that conclusion. The Board contends that there was and we agree.

### Disregard of Rightfully Expected Behavior

When Mr. Hager first accepted employment with Imperial Cup, he agreed to work all three shifts. Mr. Hager was at the bottom of the seniority ladder and he was given ten days' notice of the impending shift change. As admitted by Mr. Hager's counsel during oral argument in this Court, Imperial Cup had a perfect right to reassign Mr. Hager to a different shift. Therefore, Imperial Cup had a right to expect its employee to accept reassignment. In this employment context, Mr. Hager's adamant refusal to accept reassignment was in disregard of the standard of behavior that Imperial Cup had a right to expect.

### Willful and Deliberate

Whether Mr. Hager's refusal to accept reassignment was accompanied by a "deliberate and willful" state of mind was a factual issue for the Board to resolve. "The state of a man's mind is as much a matter of fact as the state of his digestion." *Noffsinger v. Noffsinger*, 95 Md.App. 265, 275, 620 A.2d 415 (1993) (quoting Lord Bowen in *Edgington v. Fitzmaurice*, 29 Ch.D. 459, 483 (1885)). It is a fact that cannot be proven directly. The matter is determined by drawing reasonable inferences from admitted conduct. As stated in *Department of Employment v. Jones, supra*, 79 Md.App. at 535–36, 558 A.2d 739,

> There are no hard and fast rules to determine what constitutes deliberate and willful misconduct. *Department of Employment v. Owens*, 75 Md.App. 472, 477, 541 A.2d 1324 (1988). In *Emp. Security Board v. LeCates*, 218 Md. 202, 145 A.2d 840 (1958), the Court of Appeals noted that such a determination will vary with each particular case.
>
> Here we "are not looking simply for substandard conduct * * * but for a wilful or wanton state of mind accompanying the engaging in substandard conduct. * * * [T]he

'wrongness' of the conduct must be judged in the particular employment context. * * * [C]ertain conduct will be so flagrant that indulging in it will undoubtedly be 'misconduct' whether or not a specific rule prohibiting it has been expressly formulated and posted or otherwise announced to the employees."

218 Md. at 208, 145 A.2d at 844, *quoting Sanders, Disqualification For Unemployment Insurance*, 8 Vand.L.Rev. 307, 334 (1955).

(Emphasis added.)

Mr. Hager's unyielding refusal on two separate occasions either to accept the transfer or to give any meaningful explanation to his employer for his refusal provided sufficient support for the Board's finding that Mr. Hager's conduct was deliberate. As shown below, there was also ample evidentiary support for the Board's decision that his conduct was willful. When Mr. Hager was warned that his refusal could lead to his termination, he impertinently and contumaciously retorted: "You do what you have to do." After that, he had a full day to ponder his options. On the day he was fired, when Mr. Hager was asked to respond to Imperial Cup's decision to transfer, Mr. Hager just flatly said, "No." His only explanation for never telling his employer his reasons for refusal was that he was "mad and offended" because Imperial Cup was "trying to force something on" him. Given the fact that the employer had a right to "force" the shift change, the length of time he had to think about the transfer and the manner he announced his refusal, together with his unconvincing excuse for failing to give his employer a meaningful explanation, a reasoning person appropriately could conclude that Mr. Hager's conduct was accompanied by a "willful" state of mind.

### Gross Indifference to the Rights of Imperial Cup

Telling an employer that a transfer "doesn't suit [my] lifestyle" tells the employer nothing useful. Such a terse statement coupled with the challenge to "do what you have to

do" manifested an insubordinate attitude and showed gross indifference to the employer's rights.

The conduct by Mr. Hager in this case was at least as egregious as that in *Painter v. Department of Employment,* 68 Md.App. 356, 511 A.2d 585 (1986). In *Painter,* the claimant was on sick leave for injuries received in an automobile accident. Claimant was released by her doctor to return to work in August, 1983. At the time she was released, claimant was often nauseous (due to pregnancy) and for that reason she delayed for about two and one-half months telling her employer that she had been released to return to work. In *Painter,* claimant's failure to tell her employer that she had been released to return to work was held by this Court to be "gross misconduct" within the meaning of the statutory predecessor to section 8–1002.

Mr. Hager has asked this Court to rule "as a matter of law" that an employee who refuses to accept a change in working hours because of parental child care responsibilities does not engage in misconduct of any kind. Adoption of this hard and fast rule would enable Mr. Hager to circumvent the inconvenient fact that prior to discharge he never told his employer of the conflict between the proposed shift change and his "parental child care responsibilities." This failure to give an explanation was given by the hearing examiner as one of the reasons for his finding of gross misconduct. Under the suggested rule, the trier of fact would focus exclusively on the reason for the employee's conduct, not on the conduct itself. The proposed rule would also help Mr. Hager avoid the fact that his child care problems could have been quickly solved if he had attempted a solution. Unfortunately for Mr. Hager, however, the proposed rule is not supported by the plain wording of the statute. The Secretary, under section 8–1002, is required to look at the behavior of the employee at the time disciplinary action is imposed and to answer two interrelated questions, viz:

1. Did the employee's conduct show deliberate and willful disregard of the standards of behavior that the employer has a right to expect? and

2. Did the conduct show gross indifference to the employer's interest?

Mr. Hager indisputably only had a temporary child care problem at the time he refused the shift change. He made no showing that as of July 1, 1991, the date of the contemplated transfer, he had any need to personally care for his son. He refused the shift change when it was first suggested without even attempting to see if he could make alternative child care arrangements. Mr. Hager showed indifference as to whether he kept his job or not. For these reasons, the answer to the question as to whether there has been gross misconduct is not foreordained merely because the reason for the conduct is somehow rooted in a parent's concern that he or she has "child care responsibilities."

## DID THE TRIAL JUDGE ERR IN REMANDING THE CASE TO THE BOARD FOR THE PURPOSE OF ADDITIONAL FACT–FINDING?

■ The circuit court remanded the case to the Board for "additional fact-finding" on the issue of whether Mr. Hager's conduct constituted "misconduct" within the meaning of section 8–1003. The Board contends that the case should not have been remanded. Because we hold that there were ample facts in the record to support the Board's finding that there was "gross misconduct," additional fact-finding is unnecessary. It was therefore error to remand the case.

## DID THE TRIAL COURT ERR WHEN IT DENIED MR. HAGER'S MOTIONS FOR DEFAULT AND TO STRIKE DEED'S MEMORANDUM OF LAW?

Mr. Hager raised this issue in his cross-appeal. He contends that the trial judge abused his discretion when he denied a motion for default and a motion to strike DEED's trial memorandum. Mr. Hager relies on Maryland Rule B12, which reads:

Within thirty days after being notified by the Clerk of the filing of the record, the Appellant shall file a memorandum

setting forth a concise statement of all issues raised on appeal and argument on each issue, including citations of legal authorities and references to pages of the transcript and exhibits relied on. *Within thirty days thereafter, any other party desiring to be heard, including the appropriate agency when entitled by law to be a party to the appeal, shall file an answering memorandum in the same form.* (Emphasis added.)

DEED did not file an answering memorandum within thirty days as required by Rule B12. The reply memorandum was due on May 7, 1992. On May 27, 1992 Mr. Hager filed a pleading entitled: "Motion for Default, or in the Alternative, Motion to Compel Filing of Memorandum." In that motion, he asked for a default or, as alternative relief, that DEED be ordered to file an answering memorandum "no later than June 12, 1992." On June 1, 1992, DEED filed an answering memorandum. Mr. Hager, on June 24, 1992, filed a Motion to Strike DEED's Memorandum of Law. On July 9, 1992, the circuit court heard argument on all pending matters. At the hearing, he denied Mr. Hager's Motion for Default and to Strike.

Md.Rule B12, while mandating that an appellee file an answering memorandum within thirty days, does not specify a sanction for a late filing. Md.Rule 1–201(a) provides:

(a) General.—These rules shall be construed to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay. When a rule, by the word "shall" or otherwise, mandates or prohibits conduct, the consequences of noncompliance are those prescribed by these rules or by statute. *If no consequences are prescribed, the court may compel compliance with the rule or may determine the consequences of the noncompliance in light of the totality of the circumstances and the purpose of the rule.* (Emphasis added.)

The obvious purpose of the requirement that an answering memorandum be filed within thirty days is to

ensure that an appellant will know what an appellee's arguments are in sufficient time to fully address them when a hearing is held. Here, Mr. Hager's counsel had a copy of DEED's answering memorandum more than five weeks prior to the July 9, 1992 hearing. Five weeks was adequate time to prepare fully for the hearing and Mr. Hager was in no way prejudiced by the late filing. Cf. *Gaetano v. Calvert County,* 310 Md. 121, 527 A.2d 46 (1987) (dismissal of an administrative appeal was an improper sanction against appellant for late filing of memorandum absent showing of prejudice). Under the totality of the circumstances, the trial judge did not abuse his discretion in denying Mr. Hager's motions.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH DIRECTION TO AFFIRM THE DECISION OF THE BOARD OF APPEALS OF THE MARYLAND DEPARTMENT OF ECONOMIC & EMPLOYMENT DEVELOPMENT; APPELLANT TO PAY THE COSTS.