658 A.2d 1112

**WESTINGHOUSE ELECTRIC CORPORATION**

v.

**Patrick J. CALLAHAN, et al.**

**No. 845, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

May 31, 1995.

26

Brian K. Williams (Barnett Q. Brooks, on the brief), Baltimore, for appellant.

Sheila McDonald Gill, Asst. Atty. Gen. (J. Joseph Curran, Jr, Atty. Gen. and Michele J. McDonald, Staff Atty. on the brief, for appellee Deed), Baltimore, for appellees.

Argued before WILNER, C.J., and HOLLANDER and SALMON, JJ.

HOLLANDER, Judge.

The common issue presented here concerns the determination of when appellees, who are 33 former Westinghouse Electric Corporation employees, became unemployed for purposes of entitlement to unemployment compensation benefits.[1] The Hearing Examiner of the Department of Economic and Employment Development ("DEED") concluded that all 33

---

1. Separate evidentiary hearings were conducted for each claimant and separate decisions were issued for each claimant.

appellees were qualified to collect unemployment insurance benefits as of the time that they were prospectively notified by Westinghouse, the appellant here, that their jobs would be abolished. Thereafter, pursuant to Md.Code Ann., Labor and Employment Art. ("L.E.") § 8–806(h)(4)(i), DEED's Board of Appeals (the "Board") denied review of the Hearing Examiner's decisions.[2] Westinghouse then appealed the agency's decisions[3] to the Circuit Court for Anne Arundel County, which affirmed. From that consolidated decision, Westinghouse has appealed to this Court.

Westinghouse essentially contends that appellees were employed for the two month period following notice that their jobs were going to be eliminated. Westinghouse presents the following questions for our review:

I.    Whether the claimants were unemployed as a matter of law.

II.    Whether the record contained substantial evidence in support of the Agency findings.

III.    Whether claimants [sic] receipt of retirement and severance pay disqualified them from receiving benefits under the act.

For the reasons discussed below, we answer the first two questions in the affirmative, the severance pay issue in the negative, and decline to address the retirement issue. Accordingly, we shall affirm.

---

2. The Board is also an appellee here. L.E. § 8–806(h)(4)(i) states: "If the Board of Appeals does not allow an appeal of a decision of a hearing examiner the decision of the hearing examiner is considered to be a decision of the Board of Appeals." Accordingly, the hearing examiner's decisions became the Board's decisions. *See DEED v. Hager,* 96 Md.App. 362, 369 n. 3, 625 A.2d 342 (1993) ("In cases where the Board denies review, the decision of the hearing examiner is deemed to be the decision of the Board for purposes of judicial review.").

3. Decision numbers 586–DR–93 through 617–DR–93, dated May 18, 1993, were appealed.

## Factual Background

On October 30, 1992, appellant initiated a reduction-in-force and distributed "Permanent Separation Notices" to many of its professional, management, and non-represented salaried employees.[4] The notices stated:

[A] permanent reduction in Electronic Systems Group Employment is necessary. . . .

It is my unhappy duty to notify you today, you will be laid off and that your last day on the rolls will be December 30, 1992. Any vacation to which you are entitled must be taken prior to December 30, 1992 and you are required to keep me, your supervisor abreast of your whereabouts between now and your day of separation. During the period between October 30 and December 30, 1992, normal pay practices will apply, and you will remain on the active employee rolls. Your layoff will be permanent in nature. . . .

Included with the notice was a statement entitled "Pay Policy For Laid Off Employees," directing all affected employees to report for work throughout their notice period. The employees were informed that normal pay practices would apply and, consistent with the notice, all 33 appellees received full pay and benefits between October 30, 1992 and December 30, 1992. The statement also advised that employees were required to use their vacation time before December 30, 1992 and that "employees notified of layoff will be permitted to use the resource center as required, providing they have received the prior approval of their individual supervisor." The resource center provided individual counseling, resume writing assistance, seminars, training opportunities, and employment listings. It also furnished a variety of office equipment to help the employees in their search for new employment. Although

---

4. On the same date, appellant also sent notice to the associated unions, i.e. the IBEW, the AFL–CIO, and the Salaried Employees Association, as required under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101–09. The notice stated that a permanent reduction in force was necessary, and outlined the number of represented employees who were affected.

the use of the center was not mandatory, attendance was suggested.

Evidentiary hearings were conducted by the Hearing Examiner during January and February, 1993. During the administrative hearings, the focus was establishment of the claimants' date of separation. Appellant argued that claimants were employed until December 30, 1992, as payments made to the claimants during the notice period constituted wages. Accordingly, Westinghouse claimed below, as it does here, that appellees were barred from receiving unemployment benefits during that period. The Hearing Examiner aptly stated: "The real dispute . . . is that the employer's basic contention is that your last day of work was December 30th because you were paid up to that time. . . . No dispute that you are eligible, it is just when it should start."

At the hearing, Mary Bundick, a paralegal for Westinghouse, testified that employees received salary benefits and accrued seniority that affected employees' severance pay. Moreover, during the period between notice and actual lay-off, the employees were instructed to report to work or, alternatively, to the resource center, and they were required to keep their supervisors abreast of their whereabouts.

Various appellees also testified. In sum, they said that although they received pay checks, Westinghouse did not expect them to perform their regular job duties during the notification period and, in many instances, they were unable to do so. In early December, the claimants were required to surrender their employee badges that authorized access to Westinghouse premises. Instead, they were given resource center badges.

Patrick Callahan, one of the appellees, testified: "[M]y boss told me that my full-time job is to find a job." Other appellees testified that, after October 30, 1992, they spent most of their time at the resource center. Still others stated

that they were not even required to report to work or the resource center.[5]  Appellee Charles Althoff stated:

[M]y computer access was taken away and my boss said he didn't really want me there.... So I never went back to work.  I have been to the resource center.  Sometimes you sign in the resource center, sometimes they tell you not to....  I still got the pay, but as of October 30th, I was no longer a Westinghouse employee.  As a matter of fact, that Friday your ID was taken off the computer, so you couldn't go into work anyhow....

Ultimately, the Hearing Examiner determined that appellees were, in fact, unemployed as of October 30, 1992 and that the payments made to claimants were dismissal payments, not wages, within the meaning of L.E. § 8–101(v)(1).[6]  He also determined that the claimants' job searches and their use of the resource center could not be considered work performed for Westinghouse for which wages were payable.  Rather, he stated:

The main purpose or function of the Resource Center was to help the claimant find a job and the claimant did use it for that purpose.  If anything, the Resource Center was a service provided to the claimant by the employer rather than a service performed by the claimant for the employer especially where the use of the facility was not mandatory and the claimant could no longer perform normal job duties.

The Hearing Examiner concluded that because appellees' jobs were abolished, Westinghouse's payments would not disqualify them under L.E. § 8–1009.  L.E. § 8–1009 states:

(a) *Scope of section*—This section does not apply to unemployment that results from abolishment of the individual's job.

---

**5.**  For example, Georgette Schaefer, another appellee, stated: "I called my boss and I asked him if I'm supposed to let him know where I am or whatever, and he said, 'No, it's not necessary.'"

**6.**  L.E. § 8–101(v) provides in pertinent part:  (1) Wages means all compensation for personal services except as provided in paragraph (3) of this subsection.

(b) *Effect of payment*—For each week for which the Secretary finds that an individual who otherwise is eligible for benefits receives or files or is eligible to file a claim for dismissal payment or wages in lieu of notice, regardless of whether the payment is required by law:

(1) if the payment at least equals the individual's weekly benefit amount, the individual is disqualified from receiving benefits; or

(2) if the payment is less than the individual's weekly benefit amount, the individual may receive benefits reduced by the amount of the payment.

On appeal, the circuit court recognized the merit of both parties' positions. But the court held that the evidence in the record was sufficient to support the findings of the Hearing Examiner that the claimants were unemployed from October 30 through December 30, 1992.

Additional facts pertinent to our analysis are set forth in our discussion of the issues.

## Discussion

### I. Standard of Review

Our role in reviewing an administrative decision "is precisely the same as that of the circuit court." *Dep't of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–304, 641 A.2d 899 (1994) (citing *Baltimore Lutheran High Sch. Ass'n, Inc. v. Emp't Security Admin.,* 302 Md. 649, 662, 490 A.2d 707 (1985)). This means we must review the administrative decision itself. *Pub. Svce. Comm'n v. Baltimore Gas & Elec. Co.,* 273 Md. 357, 362, 329 A.2d 691 (1974); *State Election Bd. v. Billhimer,* 72 Md.App. 578, 586, 531 A.2d 1298 (1987), *rev'd on other grounds,* 314 Md. 46, 548 A.2d 819 (1988); *see also Hager,* 96 Md.App. 362, 369–70, 625 A.2d 342 (1993).

L.E. § 8–512(d) governs judicial review in connection with the administrative adjudication of unemployment insurance benefits. It provides, in pertinent part, as follows:

In a judicial proceeding under this section, findings of fact of the Board of Appeals are conclusive and the jurisdiction of the court is confined to questions of law if:

(1) findings of fact are supported by evidence that is competent, material, and substantial in view of the entire record; and

(2) there is no fraud.

*See also, Bd. of Educ., Montgomery Co. v. Paynter*, 303 Md. 22, 34–35, 491 A.2d 1186 (1985) (interpreting the predecessor to L.E. § 8–512(d), Md.Code Ann., Art. 95A, § 7(h) (1984)); *Bd. of Appeals v. Baltimore*, 72 Md.App. 427, 431–32, 530 A.2d 763 (1987); *Adams v. Cambridge Wire Cloth Co.*, 68 Md.App. 666, 673–74, 515 A.2d 492, *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1986).

Under the case law interpreting L.E. § 8–512(d) and its predecessor, "findings of fact made by the Board are binding upon the reviewing court, if supported by substantial evidence in the record." *Baltimore*, 72 Md.App. at 431, 530 A.2d 763. *See also, Allen v. Core Target City Youth Program*, 275 Md. 69, 74–75, 338 A.2d 237 (1975). Any inference to be drawn from the facts is also left to the agency. This is because it is "the province of the agency to resolve conflicting evidence, [and] where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inference." *Baltimore Lutheran*, 302 Md. at 663, 490 A.2d 701.

In short, the test is not how the reviewing court would resolve a factual dispute or questions of credibility. *Paynter*, 303 Md. at 36, 491 A.2d 1186. Rather, the reviewing court may only determine "if, from the facts and permissible inferences in the record before the [Board], reasoning minds could reach the same result." *Baltimore Lutheran*, 302 Md. at 663, 490 A.2d 701. This means we may not reject the Board's decision if it is supported by substantial evidence, *Adams*, 68 Md.App. at 673, 515 A.2d 492, even if a different factual conclusion could have been reached. *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 515–16, 390 A.2d 1119 (1978).

It is also well settled that "the reviewing court should not substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken." *Paynter,* 303 Md. at 35, 491 A.2d 1186 (emphasis in original). *See also, Dep't of Health & Mental Hygiene v. Reeders Mem'l Home,* Inc., 86 Md.App. 447, 452, 586 A.2d 1295 (1991); *Howard County v. Davidsonville Civic & Potomac River Ass'ns, Inc.,* 72 Md.App. 19, 34–35, 527 A.2d 772, *cert. denied,* 311 Md. 286, 533 A.2d 1308 (1987). Deference to the agency's findings is based upon the recognition of the agency's expertise. "While the Board's view of [the] law is not binding on us, an agency's expertise in its particular field is entitled to deference." *Sinai Hospital v. Dep't of Employ. and Training,* 309 Md. 28, 46, 522 A.2d 382 (1987). What the Court said in *Reeders,* 86 Md.App. 447, 586 A.2d 1295, is instructive here:

> Upon appellate review, courts bestow special favor on an agency's interpretation of its own regulation. Recognizing an agency's superior ability to understand its own rules and regulations, a "court should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken."

*Id.* at 453, 586 A.2d 1295 (quoting *Bulluck,* 283 Md. at 513, 390 A.2d 1119). *See also, Hanson v. D.C. Rental Housing Comm'n,* 584 A.2d 592, 595 (D.C.App.1991) (Court of Appeals must defer to an agency's interpretation of its own regulations where that interpretation is reasonable); Kenneth Culp Davis & Richard J. Pierce, Jr., 1 *Administrative Law Treatise,* § 6.10 at 282 (3d ed. 1994) (courts defer to agency interpretation of regulations because the agency typically is in a superior position to determine what it intended when it issued a rule).

When faced with a question of law, the reviewing court must determine whether the Board made an error of law. The reviewing court may substitute its judgment on the law for that of the agency if the factual findings supported by substantial evidence are susceptible of but one legal conclusion, and the agency does not so conclude. *Ramsay, Scarlett*

*& Co. v. Comptroller of the Treasury*, 302 Md. 825, 838–39, 490 A.2d 1296 (1985).

■■■ On review, this Court must examine the agency's final decisions to determine their legality and whether there was substantial evidence from the record as a whole to support the decisions. *Paynter*, 303 Md. 22, 491 A.2d 1186. In making our review, the decisions of the administrative agency are *prima facie* correct, and the agency's decisions must be viewed in the light most favorable to the agency. *Paynter*, 303 Md. at 35–36, 491 A.2d 1186. *See also Md. State Police v. Lindsey*, 318 Md. 325, 333, 568 A.2d 29 (1990) (agency decision is presumptively correct, and test is whether there is substantial evidence to conclude that a reasoning mind reasonably could have reached the factual conclusion the agency reached); *Bulluck*, 283 Md. at 511–13, 390 A.2d 1119. Further, in interpreting the provisions at issue here, we give considerable weight to the construction of the statute by the agency responsible for administering it. *See Cons. Protection v. Cons. Publishing Co., Inc.*, 304 Md. 731, 501 A.2d 48 (1985).

> Although an administrative interpretation or construction of a state unemployment compensation statute is clearly not binding on the courts, where a state agency charged with administration of the state's unemployment compensation statute has construed or interpreted the statute in a particular way, the courts of the state, in recognition of the agency's expertise in the field, will give such interpretation great deference unless it is in conflict with legislative intent or relevant decisional law, or is clearly erroneous, arbitrary, or unreasonable.

76 AmJur2d *Unemployment Compensation* § 17 at 761 (1992).

## II. The agency's factual conclusions were supported by substantial evidence and the agency was correct as a matter of law.

Unemployment insurance law is remedial in nature and is intended "to prevent economic insecurity and to alleviate the consequences of involuntary unemployment and economic dis-

36

tress." *Allen*, 275 Md. at 75, 338 A.2d 237; *see also* L.E. § 8–102. Further,

> [t]o accomplish this important purpose, weekly income benefits are paid to individuals who have become involuntarily unemployed through no fault of their own, and who are otherwise eligible. In determining the scope of the statute and the eligibility of claimants, [the Court has] held that the provisions of the Unemployment Insurance Law should be liberally construed to effectuate its legislative intent, and any disqualifying provisions in the remedial statute should be strictly construed.

*Taylor v. Dep't of Employ. and Training*, 308 Md. 468, 472, 520 A.2d 379 (1987); *see also Sinai Hosp.*, 309 Md. at 40, 522 A.2d 382.

As a threshold matter, a claimant is eligible for unemployment benefits only if the individual is actually unemployed. L.E. § 8–801(a). Under L.E. § 8–801(b)(1), an individual is considered unemployed in any week during which he or she does not perform work for which wages are payable. L.E. § 8–801(b)(1). Wages consist of all compensation for personal services, including bonuses, commissions, and tips. L.E. § 8–101(v).

As we have noted, Westinghouse argues that appellees were employed during the 60 day notice period because they performed services and received wages. Therefore, appellant avers, they were not entitled to unemployment benefits. The Hearing Examiner determined, however, that the monies paid did not constitute wages because appellees did not perform personal services for Westinghouse during the 60 day period. As appellees received no wages, he concluded they were unemployed within the meaning of the Unemployment Insurance law, and thus entitled to benefits.

The Board has held, in other cases, that payments to individuals, in weeks where claimants performed no services, are not wages. This interpretation is based on the statutory language that an unemployed individual is one who "does not perform work for which wages are payable." L.E. § 8–801(b).

*Abbott, et al. v. Westinghouse Electric Corp.*, No. 1458–BH–91 (Nov. 18, 1991), is instructive. In that case, former Westinghouse employees filed claims for unemployment insurance benefits after receiving notice that they were being laid off from work. Some of the employees were kept on the payroll for one month, and were paid regardless of whether they reported to work. Additionally, during this one month period, employees were told they should either report to work or visit the Career Counseling Center, which would help employees find other jobs.

The issue in *Abbott*, as in this case, was the date on which the claimants became unemployed. The employer claimed that payments made to the claimants were wages and therefore the claimants were not unemployed during the one month period. The Board disagreed because the employer's argument failed to take into account the statutory requirement that the employee "perform work" for the payments. The Board stated:

> The Board has consistently interpreted the statute as written. Payments made in weeks during which no services were performed, *Dayton* (199–BR–83), including payments made for services performed in the past, *Markowski v. Baltimore County Personnel* (749–BR–82), *Lendo v. Garrett County Board of Education* (299–BR–82) [,] do not take the recipients out of the category of the "unemployed," for the purposes of the Unemployment Insurance Law.

*Abbott*, at 3.[7] The Board concluded that, because visits to the Career Counseling Center did not qualify as performing services for the employer, the claimants were, indeed, unemployed.

---

7. The Board further explained that it recognized "the reasoning behind the employer's unwillingness to have its former employees collect paychecks and unemployment benefits for the same four weeks." The Board rationalized, however, that "[although this may seem like an unusual result, the legislature has clearly chosen to be generous to those whose jobs have been permanently lost." *Abbot*, at 5.

Similarly, in *Fusco et. al. v. Steamship Trade Assoc.*, No. 1388–BH–91 (Nov. 6, 1991) (*aff'd,* Baltimore City Circuit Court, No. 9134062/C41388), the Board considered whether payments made to claimants were wages within the meaning of L.E. § 8–101(v). There, longshoremen applied for unemployment insurance benefits, claiming they met the initial eligibility requirement of having earned wages in the previous quarter. The facts showed, however, that they actually had received "Guaranteed Annual Income Fund" (GAIF) payments in exchange for being available for hire. In order to receive the GAIF payments, the claimants were required to report to a central hiring hall in the morning, from which they were dispatched to whatever work was available. Employees that were not assigned any work for the day were allowed to leave after an hour and were eligible to receive GAIF benefits for the day. The Board concluded: "The facts of this case do not establish that the claimants were paid wages as defined by Section 8–101(v). No services were provided ... other than reporting to the Hall ... to see if work was available."

Although not binding on us, we defer to the agency's expertise; we are persuaded by the Board's consistent application of the statutory standard that deems payments as wages only if given as compensation for services rendered. The Board's analysis also comports with the reasoning of courts in other jurisdictions, where the statutory language is comparable to Maryland.

In *Capitol Castings v. Dept. of Econ. Security*, 171 Ariz. 57, 828 P.2d 781 (App.1992) [8], an employer closed one of its plants and chose to pay laid-off employees their usual salaries and benefits for 60 days after their last day of work, rather than provide the 60 day notice of plant closing required by the

---

8. The applicable statute in *Capitol Castings* provided that "an applicant is deemed unemployed for any period during which "[1] he performs no services and [2] with respect to which no wages are payable to him...." *Id.* at 783. Wages were defined as "all remuneration for services from whatever source, including commissions, bonuses and fringe benefits and the cash value of all remuneration in any medium other than cash." *Id.* at 784.

Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101–09.

The agency decided that the payments did not constitute wages for the purpose of unemployment compensation benefits. On review, the court affirmed the agency's decision permitting the employees to receive compensation. In concluding that the payments were not wages, the court stated that its determination was consistent with both the statutory definition and with the legislative intent to give the Employment Security Act broad and liberal coverage.

The case of *Georgia–Pacific Corp. v. Unemploy. Comp. Bd. of Review,* 157 Pa.Cmwlth. 651, 630 A.2d 948 (1993), is also noteworthy. There, the corporation ceased operations prior to the 60 day notice required by WARN. Accordingly, the employer paid employees severance pay as well as the requisite WARN payments. The employer argued on appeal that the claimants should not receive benefits for the period covered by the WARN payments. The reviewing court held, however, that the payments were not remuneration under the unemployment compensation laws. The court reasoned that, although the WARN payments were "made 'with respect to' the claim weeks at issue, [they] were not made in recognition of any services Claimants performed for [the employer] either during those weeks or at any other time." *Id.* at 955. *See also In the Matter of the Claim of Baxter,* 159 A.D.2d 845, 552 N.Y.S.2d 711 (1990) ("[W]here claimant has done no work for his employer, the weeks for which he received severance and vacation payments cannot be converted into 'weeks of employment' since the employer-employee relationship has been terminated."); *Hock v. Unemployment Comp. Bd. of Review,* 50 Pa.Cmwlth. 517, 413 A.2d 444 (1980) (court found that a claimant who received dismissal pay for eleven weeks after termination was unemployed within the meaning of compensation statute); *Western Electric Co. v. Hussey,* 35 N.J. 250, 172 A.2d 645 (1961) (claimant who received "lay off" allowance for one month was eligible for unemployment compensation because payment was not wages and claimant was not "continued in employment during that period").

The foregoing cases make clear that the Hearing Examiner properly focused on whether the claimants received "dismissal payments" or "wages" and whether claimants *performed work* within the 60 day period in issue. The Hearing Examiner made specific findings concerning each employee, after listening to many days of testimony. The conclusion that claimants did not perform work for which wages were payable is supported by substantial evidence in the record.

As noted earlier, appellant's contention that appellees were required to report to the Resource Center or their work site was widely contradicted by the employees' testimony. For. example, appellee Sherrie Snowden said: "It depended on our supervisors, who we had, whether or not we wanted to go to work or to the resource center. I was told by my supervisor that I did not have to report to work. He said I could do whatever I wanted to do." A Westinghouse representative corroborated that attendance at the resource center was only suggested, but not mandatory.

It is also significant that the employees, in many instances, were not able or expected to perform their jobs during this period. For example, appellee Eugene Nepa testified that his supervisor told him "to forget about the job, because I was no longer—had computer access and there was no access to the facilities." [9] Charles Althoff, another appellee, testified that when an employee asked "If I find a job tomorrow, can I take it?," the employee was advised: "Yes, you take it. You are not a Westinghouse employee." Similarly, appellee Frank Waters stated:

> We were not invited to stay in the building, and we were told, yes, that the resource center was available to us and that we could go to the resource center, which I have availed myself of on a continuing basis. My supervisor did not tell me personally that I needed to tell him every time I went to the resource center.... The day of the notice ...

---

9. When asked whether he went to the resource center instead of work, Ralph Chamberlain, an appellee, said: "Well, they don't expect you to—I mean, they take—don't expect us to work."

I could not log on the system with my password and code. I could not perform my function as a supervisor in any capacity....

In addition, there is substantial evidence in the record that demonstrates that the activities performed at the Resource Center were not intended to benefit the corporation. Rather, Westinghouse was providing a service for the claimants. In discussing the purpose and the goals of the Resource Center, Steve Kawakami, the Human Resource Manager, explained:

The resource center was established by Westinghouse as a centralized location where individuals who were effected [sic] by the reduction in force could obtain assistance in their job search activity. And we have put a great quantity of equipment ... into making the center as useful as possible for folks who have been effected.... We also have sponsored a number of training seminars, speakers, all sorts of activities, all geared toward assisting employees who are effected to obtain employment.

We acknowledge that the employees have "double dipped." Nevertheless, our conclusion that the money Westinghouse paid to the employees did not constitute wages is compelled by the particular facts of this case and our construction of the applicable statute. Any statutory change must be effected by the Legislature. In light of the foregoing, we conclude that the agency's factual determinations were supported by substantial evidence. Further, the agency did not err, as a matter of law, in determining that appellees did not perform work for Westinghouse.

## III. Retirement and severance pay

█ Appellant argues that those appellees who received severance payments ("permanent separation allowance") or retirement payments are disqualified from receiving unemployment compensation, based on L.E. § 8–1008 and L.E. § 8–1009. These sections provide that for each week that an individual who otherwise is eligible for benefits receives a retirement payment (L.E. § 8–1008(b)) or a dismissal payment

or wages in lieu of notice (L.E. § 8–1009(b)) that is at least equal to the individual's weekly benefit amount, the individual is disqualified from receiving benefits for that week. Each of these provisions has exceptions that make lump sum retirement (L.E. § 8–1008) or dismissal payments (L.E. § 8–1009) nondeductible if the unemployment is a result of a "layoff or shutdown" (L.E. § 8–1008) [10] or that "results from abolishment of the individual's job" (L.E. § 8–1009) [11].

As to the severance pay, the evidence in the record clearly illustrates that the terminations resulted from "a permanent reduction in Electronic Systems Group employment." Indeed, Westinghouse does not contend otherwise. Accordingly, because appellees' jobs were abolished, any severance payments would not be disqualifying under L.E. § 8–1009.

■ As to the issue concerning retirement benefits, we hold that the issue is not properly before us; it either was not raised and considered below, or it was raised initially but later withdrawn. We explain.

On appeal, Westinghouse claims that appellees Chamberlain, Robinson, Reynolds, Rabickow, Turley, Burns, Charvat, Walker, White, and Althoff received some form of retirement payment, effective January 1, 1993, and were therefore disqualified from receiving unemployment compensation. A review of the record demonstrates, however, that the issue was either not raised or it was expressly withdrawn. For instance,

---

**10.** L.E. § 8–1008 provides in pertinent part:
(b) *Effect of payment*—(1) For each week in which the Secretary finds that an individual who otherwise is eligible for benefits receives a retirement payment:
(i) if the weekly amount of the retirement payment computed under subsection (c) of this section at least equals the individual's weekly benefit amount, the individual is disqualified from receiving benefits for that week. . . .

\*    \*    \*    \*    \*    \*

(2) A retirement benefit in the form of a lump sum payment that an employing unit pays as a result of a layoff or shutdown shall not be deducted from benefits for the period of eligibility.

**11.** *See* n. 7, *supra.*

at the hearings for Rabickow, Reynolds, Burns, Charvat, and White, Westinghouse proceeded only on the issues of severance pay and the date of unemployment, expressly withdrawing all other claims.[12] At the hearings for Chamberlain and Robinson, the Hearing Examiner noted that the proceeding was only to determine the date of unemployment. Indeed, he said: "[T]he sole question . . . is not that you are eligible for unemployment, but the day that they start. That's it." At Robinson's hearing, the Hearing Examiner again noted the effect of retirement benefits "is not an issue. . . ."

Moreover, at Turley's hearing, the Hearing Examiner specifically asked if Westinghouse would be proceeding on the question of whether "benefits should be reduced on account of the receipt of a pension," and was advised that the issue had been withdrawn. The same scenario occurred at Althoff's hearing.[13] At the hearing for Willie Walker, appellant also withdrew the claim regarding pension benefits. In that hear-

---

**12.** For example, at the hearing for Bernard White, the following transpired:

Hearing Examiner: Okay. The first issue, and this [Appeal Number] . . . 25901, is whether the claimant's separation from employment was for a disqualifying reason. In the past, you have withdrawn appeals on all those issues.

Ms. Bundick: Yes.

Hearing Examiner: Okay. So they are not disputing that you were laid off and there was no misconduct on your part. . . . So that case will be withdrawn. You will get a little notice that that one is withdrawn. The one in 902 deals with severance pay, and this is the one that they are really appealing and it is that the claimant is in receipt of severance pay, since the claimant's job separation resulted from his job being abolish [sic], is not a bar to benefits. . . . I think I should say up front that it is not the fact that you are entitled to unemployment insurance benefits is not really in dispute. It is the date they should start. . . . The Agency has found that you [sic] pay after October 30th was severance pay and not wages, and that is really what—did I sum that up pretty good for you, Mr. Lutz?

Mr. Lutz (Westinghouse): I think that is very well. I think you did—

**13.** At the hearing for Charles Althoff, the Hearing Examiner stated: "The third [issue for appeal] is, your benefits should be reduced on account of the receipt of a pension, under section 1008, and you are going to withdraw that as well? Okay. So we are getting rid of two of these." The Hearing Examiner then proceeded to determine whether appellee's last day of work was December 30th or October 30th, 1992.

**44**

ing, the Examiner explained: "So the pensions are going to be withdrawn.... Now, this withdraw means that I [sic] can't be reopened. So that is kind of—I don't want to use the term—let's call it permanent. Let's not call it fatal, but that is what happened." Appellant did not contest the Hearing Examiner's statement, but instead proceeded to argue its claim that appellees were employed through December 30, 1992.

In sum, on several occasions the Hearing Examiner noted that the issue of retirement payments was not before him.[14] Moreover, Westinghouse expressly withdrew the question from consideration in many of the proceedings. No evidence was ever adduced with respect to the issue and thus no factual findings were made. As no factual record was developed, we are unable to perform any review function. *See Heft v. Md. Racing Comm'n*, 323 Md. 257, 273–74, 592 A.2d 1110 (1991) ("[A] person may not obtain judicial review of a matter when he or she failed to properly raise the matter before the agency."). Accordingly, we hold that the issue of retirement benefits is not before us on appeal.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

**14.** Although the Hearing Examiner was aware of the issue relating to retirement benefits, he declined to consider it. For example, in one hearing, the following interaction occurred:

Hearing Examiner: So are you going to take the early pension?

Mr. Rabickow: Well, I have no choice in the matter. That is what they are telling me I have to do....

Hearing Examiner: You will get a pension starting January the 1st.

Mr. Rabickow: Well, yes. I am supposed to draw my first check somewhere along the first week of February, and that will be for January and February, at this point.

Hearing Examiner: Are you going to take it in annuity form rather than lump sum?

Mr. Rabickow: That is correct.

Hearing Examiner: I haven't got that issue, but it just seems like it ought to be a question I ought to ask.